UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    Case No. 20-cr-223 (WMW/LIB)

              Plaintiff,

v.                                           **ORDER AND**
                                             **REPORT AND RECOMMENDATION**

Kyle Dale Clark (1),
Valerie Ann Clark (3),
Drew Williams Graves (7),

              Defendants.

      This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Kyle Dale Clark's ("Defendant Kyle Clark") Motion for Disclosure of Confidential Informants, [Docket No. 122]; Defendant Kyle Clark's Motion to Suppress Searches and Seizures, [Docket No. 125]; Defendant Kyle Clark's Motion to Suppress Statements, [Docket No. 126]; Defendant Drew Williams Graves's ("Defendant Graves") Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 135]; and Defendant Valerie Ann Clark's ("Defendant Valerie Clark") Motion to Suppress Evidence Obtained as a Result of Search and Seizure. [Docket No. 145]. The Court held a Motions Hearing on June 10, 2021, regarding the parties' pretrial motions.[1]

      At the Motions Hearing, the parties requested, and were granted, the opportunity to submit supplemental briefing. Upon the completion of that briefing, Defendant Kyle Clark's Motion for Disclosure of Confidential Informants, [Docket No. 122]; Defendant Kyle Clark's Motion to Suppress Searches and Seizures, [Docket No. 125]; Defendant Kyle Clark's Motion to

---

[1]The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Order. [Docket No. 197].

Suppress Statements, [Docket No. 126]; Defendant Graves's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 135]; and Defendant Valerie Clark's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 145], were taken under advisement.

For the reasons discussed herein, Defendant Kyle Clark's Motion for Disclosure of Confidential Informants, [Docket No. 122], is **DENIED**.

Further, for reasons discussed herein, the Court recommends that Defendant Kyle Clark's Motion to Suppress Searches and Seizures, [Docket No. 125]; Defendant Kyle Clark's Motion to Suppress Statements, [Docket No. 126]; Defendant Graves's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 135]; and Defendant Valerie Clark's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 145], be **DENIED**.

## I.    Background and Statement of Facts

### A.  Background

Defendant Kyle Clark, Defendant Valerie Clark, and Defendant Graves are three of the eight persons named in the present Indictment. [Docket No. 1]. Defendant Kyle Clark and Defendant Valerie Clark are each charged with one (1) count of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. (Indictment [Docket No. 1]). Defendant Kyle Clark is also charged with one (1) count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Indictment [Docket No. 1]). Defendant Graves is charged with one (1) count of having sold or transferred a firearm to a prohibited person in violation of 18 U.S.C. §§ 922(d)(1) and 924(a)(2). (Indictment [Docket No. 1]).

**B. Facts**[2]

The record presently before the Court indicates that on September 4, 2019, an unknown male individual[3] committed a robbery of the Redby Post Office in Redby, Minnesota. (Gov't's Ex. 1).[4] This unknown individual took approximately $8,400.00 from the Redby Post Office. (Id. at 4). The Redby Post Office had $8,400.00 because on the day of the robbery the Redby Post Office had its highest daily amount of money order sales for the 2019 calendar year with "nearly $3,200 more than the amount of money orders sold on the next highest business day prior to September 4, 2019." (Id. at 5).

In the investigation of the September 4, 2019, robbery, Postal Inspector John Livingston ("PI Livingston") and Postal Inspector Matthew Hoffman ("PI Hoffman") interviewed the employee who was on duty during said robbery. (Id. at 6). Through that interview, PI Livingston and PI Hoffman learned that on September 4, 2019, three individuals each separately purchased $2,000.00 worth of Post Office money orders in $1,000.00 increments using cash proceeds to complete the purchases. (Id.). One of these individuals was identified as J.C., Defendant Kyle Clark's sister, and another individual was identified as Defendant Kyle Clark. (Id.). After Defendant Kyle Clark purchased $2,000.00 in money orders, Kalyssa White,[5] Defendant Kyle Clark's girlfriend, returned to the Redby Post Office to exchange one of the money orders earlier purchased by Defendant Kyle Clark for a "new, blank money order." (Id.). The money order she exchanged had the name "Othoniel Hernandez Cruz" written in the "Pay To" field. (Id.).

---

[2] The facts contained in this section are derived from the testimony of Red Lake Police Officer Pat Bendel (hereinafter "Officer Bendel") at the June 10, 2021, Motions Hearing, as well as, the Government's exhibits admitted in the present case.

[3] On the record now before the Court, it does not appear that this individual has been apprehended or identified.

[4] Government's Exhibit 1 is the warrant application, supporting affidavit, and warrant to search two cellular telephones. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 1. (Tr. 8).

[5] Ms. White is a co-defendant in the present Indictment, however, she is not party to any of the present Motions.

Later that same day on September 4, 2019, Defendant Kyle Clark deposited the six $1,000.00 money orders described above, as well as, one additional $1,000.00 money order—also purchased on September 4, 2019, from the Redby Post Office—into the bank account of Othoniel Hernandez Cruz, a resident of Mexico. (Id. at 6–7). The surveillance video from the Wells Fargo bank branch were Defendant Kyle Clark conducted this transaction shows Defendant Kyle Clark standing next to another individual while Defendant Kyle Clark conducts the transaction, and the two individuals can be seen looking at their phones throughout the transaction. (Id. at 7).

In his investigation of the robbery, PI Hoffman also reviewed United States Post Office records related to items mailed to and from Redby, Minnesota and Red Lake, Minnesota; the purchase of $1,000.00 money orders from the post offices in Redby, Minnesota or Red Lake, Minnesota; and the correlation between these two topics. (Id. at 8). PI Hoffman's review of these business records "reveal[ed] a pattern of money order purchases, Priority Mail Express envelopes mailed from Redby to locations in California, and Priority Mail packages of seven pounds or more mailed from California to Redby or Red Lake, Minnesota." (Id.). His review of the business records revealed the following four sets of circumstances which he thought to be related.

> a. On September 4, 2019, the day of the Redby Post Office robbery, the six $1,000 money orders sold/exchanged in Redby that day, as well as a $1,000 money order sold in Redby that day, were deposited by [Defendant Kyle Clark] into the account of Othoniel Hernandez [Cruz], a resident of Mexico. All seven money orders had [Defendant Kyle Clark's] name written in the "From" section, and one of the money orders had [Kalyssa White's] name also in the "From" section, but crossed out. On September 12, 2019, [a] Priority Mail package . . . weighing 7 pounds, 10 ounces, was mailed from Wilmington, California (a city in the Los Angeles metropolitan area), to an address in Red Lake, Minnesota. Business records from the USPS and Paul Bunyan Communications show that delivery status of this package was tracked by an IP Address assigned to an

4

account in the name of [Defendant Valerie Clark], [Defendant Kyle Clark's] mother.

b. On September 24 and 26, 2019, six $1,000 money orders were purchased at Redby and Red Lake Post Offices. On September 27, 2019, [a] Priority Mail Express letter . . . weighing 11 ounces was mailed from Redby to S.M. at an address in Wilmington, California. On September 30, 2019, [a] Priority Package . . . weighing 7 pounds 10 ounces was mailed from Carson, California (approximately five miles north of Wilmington, California) to J.C.'s address in Redby. Business records from the USPS and Paul Bunyan Communications show that delivery status of this package was tracked by an IP Address assigned to an account in the name of [Defendant Valerie Clark], [Defendant Kyle Clark's] mother. On October 3, 2019, the six $1,000 money orders payable to S.M., [sic] were cashed in different Los Angeles area post offices.

c. On October 3 and 8, 2019, three $1,000 money orders were purchased from the Redby Post Office. On October 8, 2019, [a] Priority Mail package . . . weighing 7 pounds and 10 ounces was mailed from Carson, California, to J.C.'s address in Redby, but was addressed to [Kalyssa White]. Business records from the USPS and Paul Bunyan Communications show that delivery status of this package was tracked by an IP Address assigned to an account in the name of [Defendant Valerie Clark], [Defendant Kyle Clark's] mother. On October 9, 2019, [a] Priority Mail Express envelope . . . weighing 4 ounces was mailed from Redby to an address in Wilmington, California. On October 16, 2019, the three $1,000 money orders were cashed by S.M. and G.O. at the Los Angeles Post Office.

d. On October 22, 2019, three $1,000 money orders were purchased at the Redby and Red Lake Post Offices. Also on October 22, 2019, [a] Priority Mail Express envelope . . . weighing 2 ounces was mailed from Redby to an address in San Diego, California. On October 24, 2019, [a] Priority Mail package . . . weighing 7 pounds 0 ounces was mailed from Carson, California, to an address in Red Lake. The package was delivered on October 28, 2019. On November 4, 2019, two of the three $1,000 money orders (one purchased from Redby and one from Red Lake) were cashed by T.E. at a check-cashing store in San Diego. Both cashed money orders had [Defendant Kyle Clark's] name written in the "From" section.

(Id. at 8–10).

Early in the week of November 2, 2019, Red Lake Criminal Investigator Ron Leyba issued a "BOLO" (be on the lookout) alert instructing officers to be on the lookout for "a marron GMC Yukon with nice rims making drops around the reservation." (Tr. 35–38).[6] Officer Bendel

---

[6] Officer Bendel testified that by "making drops" he meant "stopping at particular houses that are dealing narcotics and then dropping off product for them to sell." (Tr. 36).

testified that Criminal Investigator Leyba received the information regarding the GMC Yukon from a confidential informant. (Tr. 63–64).[7]

Shortly after 11:00 p.m. on November 2, 2019, Officer Bendel observed a maroon GMC Yukon matching the BOLO description "pulling out of a known drug house"[8] on the Red Lake Indian Reservation "by Highway 1." (Tr. 35, 38). Officer Bendel followed the GMC Yukon until the GMC Yukon pulled into another residence, which law enforcement suspected to be the location of other narcotics activity, on East Bartons Camp Road. (Tr. 38–39).[9] Specifically, the GMC Yukon pulled into the driveway of the residence, and it drove off the driveway into the backyard of the residence into a position where the GMC Yukon could not be viewed from the road. (Tr. 79–81). Officer Bendel continued approximately a "residence and a half down" East Bartons Camp Road where he stopped his vehicle and turned off his lights, including his squad car camera. (Tr. 38–40). From his stopped vehicle, Officer Bendel continued to observe the GMC Yukon through the use of his night vision googles. (Tr. 38–40). Officer Bendel observed two to three individuals "coming and going from the vehicle and either bringing things out to the car or taking them out and bringing them inside the residence." (Tr. 40–41).

This surveillance lasted approximately fifteen to twenty minutes, during which time Officer Bendel also observed two other vehicles "come and go quickly" from the residence. (Tr. 41–42). Officer Bendel testified that although the two other vehicles separately pulled up to the house, the conduct of the persons in both vehicles at the residence was the same for both

---

[7] Throughout this Order and Report and Recommendation, the undersigned refers to the transcript of the June 10, 2021, Motions Hearing, [Docket No. 183], by the abbreviation "Tr."

[8] Officer Bendel testified that he described the house as a "known drug house" because "at least" four years prior to the present incident law enforcement officers executed a search warrant at the home which resulted in the recovery of a "large amount of narcotics out of the residence." (Tr. 37). Officer Bendel testified that the seizure from said residence was "the biggest seizure [of narcotics] they had had in a long time," and since that time, Officer Bendel "had stopped cars that had pulled into that residence before that had product inside." (Tr. 61–62).

[9] Officer Bendel testified that law enforcement considered this second residence a "known drug house" because Red Lake Criminal Investigator Ron Leyba had provided law enforcement officers with information indicating possible narcotics activity at this second residence. (Tr. 61–63).

vehicles: an individual exited the vehicle to enter the residence, within a minute or two the individual exited the residence to reenter the vehicle, and the vehicle left. (Tr. 42).

When the GMC Yukon left this second residence, Officer Bendel continued to follow it. (Tr. 42). Officer Bendel observed the GMC Yukon turn right to continue through the Bartons Camp area at which time he observed the GMC Yukon accelerate to a high rate of speed. (Tr. 42). To catch up to the GMC Yukon, Officer Bendel was required to travel at 55 to 60 miles per hour, and once he caught up to the GMC Yukon, Officer Bendel paced the GMC Yukon as travelling 40 to 45 miles per hour. (Tr. 42).[10]

Officer Bendel paced the GMC Yukon for approximately 100 yards until it continued onto a dead-end road at which point he initiated a traffic stop. (Tr. 42–43). Officer Bendel initiated the traffic stop by turning on his patrol lights, and the GMC Yukon pulled to the side of the road. (Tr. 42–46). Officer Bendel then exited his patrol vehicle, and he approached the GMC Yukon's driver's side door. (Tr. 42–46). As he approached the driver's side door, Officer Bendel shined his flashlight into the vehicle where he observed a large amount of "automotive audio equipment" and one female passenger. (Tr. 42–46). The driver later identified himself as Defendant Kyle Clark. (Tr. 42–46). The female passenger was later identified as Kalyssa White. (Tr. 53).

Officer Bendel then advised Defendant Kyle Clark that he had been pulled over because he had been going 40 to 45 miles per hours in a 25 miles per hour zone. (Tr. 47–51). Defendant Kyle Clark asserted that he was only travelling at 35 miles per hour, and Officer Bendel informed Defendant Kyle Clark that travelling at 35 miles per hour was still speeding. (Tr. 47–51).

---

[10] Officer Bendel testified that the speed limit on the road at that time was 25 miles per hour. (Tr. 42).

After Officer Bendel obtained identification information from Defendant Kyle Clark and Ms. White, Officer Bendel returned to his squad vehicle to conduct a Tribal and NCIS check on both parties. (Tr. 47–51). While Officer Bendel was gathering this information, "K9 Officer Hamre" arrived at the scene of the traffic stop. (Tr. 47–51).

Officer Bendel then walked back to GMC Yukon, and he asked Defendant Kyle Clark where he was going. (Tr. 47–51). After Defendant Kyle Clark stated that he was headed to his home in Redby, Minnesota, Officer Bendel inquired as to why Defendant Kyle Clark was headed down a dead-end road in the opposite direction of Redby, Minnesota, if he was indeed headed home. (Tr. 47–51). Officer Bendel also asked Defendant Kyle Clark why he was headed to the cul-de-sac at the end of the dead-end road, and Defendant Kyle Clark was unable to provide a response. (Tr. 47–51). According to Officer Bendel's testimony at the Motions Hearing, Defendant Kyle Clark then became "extremely nervous," including "stuttering a little bit" and becoming "shaky." (Tr. 47–51). At that point, Officer Bendel instructed Defendant Kyle Clark to exit the vehicle to continue their conversation. (Tr. 47–51).

After walking Defendant Kyle Clark to the rear of the GMC Yukon, Officer Bendel attempted to clarify where Defendant Kyle Clark was headed. (Tr. 51–56). Defendant Kyle Clark stated that he and Ms. White were "just driving around." (Tr. 52). At that point Officer Bendel requested permission to search the vehicle, but Defendant Kyle Clark responded "No, you get a warrant." (Tr. 52). Officer Bendel then told Defendant Kyle Clark that he was going to have Officer Hamre's canine walk around the GMC Yukon. (Tr. 51–56).

Officer Bendel then approached the passenger's side of the vehicle to instruct Ms. White to exit the vehicle while the canine walked around the vehicle; Officer Hamre and Officer Heuer, who had also arrived on the scene, stayed with Defendant Kyle Clark. (Tr. 51–56). While

8

approaching Ms. White who was still seated in the front passenger's seat of the GMC Yukon, Officer Bendel shined his flashlight into the back seat of the GMC Yukon where he observed "burned tin foil" approximately three inches long and one and a half inches wide with "a dark residue on top." (Tr. 53–54, 74). At the Motions Hearing, Officer Bendel testified that, in his training and experience, the burnt tin foil was indicative of the use of narcotics. (Tr. 51–56).

Upon viewing the burnt tin foil, Officer Bendel returned to Officer Hamre to instruct Officer Hamre that they no longer required the use of the canine. (Tr. 51–56). Officer Bendel then went to his vehicle to retrieve gloves to wear during his search of the vehicle. (Tr. 51–56). While Officer Bendel was retrieving his gloves, Defendant Kyle Clark ran from the traffic stop at which time Officer Heuer yelled, "He's running." (Tr. 55).

Officer Hamre and Officer Bendel engaged in a short pursuit of Defendant Kyle Clark on foot until Defendant Kyle Clark tripped and fell. Officer Bendel estimated that Defendant Kyle Clark ran approximately the length of a "quarter acre" across a yard and ten yards into the woods before Defendant Kyle Clark tripped. (Tr. 51–56). After Defendant Kyle Clark fell, Officer Bendel "held him at taser point" while Officer Hamre secured Defendant Kyle Clark in handcuffs. (Tr. 56). Defendant Kyle Clark was then escorted back to Officer Bendel's squad vehicle, advised of his <u>Miranda</u>[11] rights, and secured in the back seat of Officer Bendel's squad vehicle. (Tr. 56).[12]

During the pursuit of Defendant Kyle Clark, Officer Heuer remained with the Ms. White at the GMC Yukon. (Tr. 51–56). Before Officer Bendel and Officer Hamre returned with Defendant Kyle Clark, Officer Heuer had placed Ms. White in handcuffs, located narcotics paraphernalia on her person, and placed her in the back of his squad vehicle. (Tr. 56–61).

---

[11] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).
[12] Defendant Kyle Clark was ultimately issued a citation for speeding. (Tr. 67).

The Officers then began searching the GMC Yukon. (Tr. 56–61). In the search of the GMC Yukon, the Officers located a Louis Vuitton backpack, inside which they discovered a handgun, a loaded firearm magazine, a candle, and approximately $5,600.00 in cash; another loaded firearm magazine in the center console; a cellular telephone; and a police radio which could be used to monitor and scan the Red Lake "police channel." (Tr. 56–58, 79). The Officers observed that the candle was wrapped in bubble wrap with a "crystal-like substance on top." (Tr. 58). That substance field tested as negative as narcotics. (Tr. 58). The search of the GMC Yukon took approximately twenty to thirty minutes. (Tr. 58). At the conclusion of the search of the GMC Yukon, the Officers requested a tow truck to take the GMC Yukon, and they transported both Defendant Kyle Clark and Kalyssa White to the Red Lake Jail. (Tr. 56–61).

After Officer Bendel took Defendant Kyle Clark to the jail, Officer Bendel searched the back of his squad vehicle where he located a small bag of green leafy substance and a bag with two unmarked pills which Officer Bendel testified were not in his squad vehicle prior to Defendant Kyle Clark being placed in the squad vehicle. (Tr. 58–61). Officer Bendel then began processing the items seized from the GMC Yukon. (Tr. 56–61). While doing so, he observed that the "wax wasn't consistent across the entire candle" and "the wick also went all the way down the side, which was not a normal candle." (Tr. 59–60). He also observed cellophane or plastic wrap inside the candle in the areas where the candle wax created gaps in the wax. (Tr. 60). Officer Bendel "cut it open with [his] knife and observed a crystal-like substance inside" which field tested as positive for methamphetamine. (Tr. 59–60).

On November 7, 2019, Red Lake Criminal Investigator Ron Leyba submitted an application for a Tribal search warrant to authorize law enforcement to further search the GMC

Yukon. (Gov't's Ex. 6).[13] The application sought to search for the following: any controlled substances; items associated with the possession and distribution of any controlled substance; written materials documenting the sale or possession of controlled substances; documents, photographs and other items related to the transfer of funds, the tracking or delivery of mail or packages; documents and other items related to the purchasing, cashing, depositing, or transfer of money orders; documents and other items related to the opening or use of post office boxes; indicia of residency or occupancy; and electronic data tending to show ownership of property and involvement in narcotics "use or sales, to include computers, laptops, cellular phones, and other electronic devices, as well as, the authority to transport said electronic items for forensic examination. (Id.).

In his affidavit in support of the search warrant authorizing law enforcement to search the GMC Yukon, CI Leyba provided the details of the investigation, as described above, including the November 2, 2019, traffic stop. (Id.). CI Leyba also noted that the packages from Wilmington, California and Carson, California, as described by PI Hoffman, all bore similar handwriting. (Id.). CI Leyba attested that based on his training and experience individuals involved in narcotics trafficking use money orders to purchase contraband; enlist the assistance of multiple persons to purchase money orders on their behalf to avoid United States Department of Treasury reporting requirements; use multiple addresses to receive contraband; and use expedited services, such as Priority Mail and Priority Mail Express, to limit the duration of time the articles remain in the delivery system. (Id.). CI Leyba further attested that when individuals use these methods for narcotics trafficking, said individuals are often required to submit payments to the seller in advance, either through mailing money orders or depositing said money

---

[13] Government's Exhibit 6 is the warrant application, supporting affidavit, and warrant to search the GMC Yukon. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 6. (Tr. 8).

orders into the seller's bank account, before the seller will mail the narcotics. (Id.). Lastly, CI Leyba attested that California is a known source state for narcotics, including methamphetamine. (Id.).

On November 7, 2019, a Judge of the Tribal District Court determined that probable cause existed to support the issuance of the November 7, 2019, GMC Yukon Search Warrant. (Id.). Thereafter, law enforcement officers executed the November 7, 2019, GMC Yukon Search Warrant. (Id.).

As a result of the execution of the November 7, 2019, GMC Yukon Search Warrant, law enforcement officers discovered a second cellular telephone and various drug paraphernalia. (Gov't's Ex. 6 at 13). Law enforcement officers also discovered United States Post Office Receipts for five $1,000.00 money orders purchased from the Redby Post Office on September 4, 2019. (Id.).

On February 7, 2020, Kalyssa White attempted to claim the two cellular telephones from the Red Lake Police Department. (Id.). She was not permitted to take possessions of the cellular telephones.

 On February 28, 2020, PI Hoffman submitted an application for a federal search warrant to authorize law enforcement to search the contents of two cellular telephones which had been seized from the GMC Yukon. (Gov't's Ex. 1). In the affidavit the cellular telephones were referred to as "Device 1 and Device 2," and each phone was identified by its unique International Mobile Equipment Identity number. (Id.). The application sought to search for the following: all records on Device 1 and Device 2 that constitute "fruit, evidence and/or instrumentalities of violations of" 18 U.S.C. §§ 2, 641, 2114; 21 U.S.C. §§ 841(a)(1), 843(b), and 846; and 31 U.S.C. § 5324 involving Travis Juarez, Defendant Kyle Clark, Kalyssa White, "K.S., J.C., [Defendant

Valerie Clark], S.M., or other unknown conspirators . . . ." (Gov't's Ex. 1). The application for the search warrant noted that such items would include information pertaining to the identity of persons who had used Device 1 or Device 2, including records identifying the whereabouts of those persons; evidence indicating how and when Device 1 or Device 2 had been used; evidence indicating the location of Defendant Kyle Clark and Kalyssa White on the dates relevant to the investigation of the Redby Post Office; information or communications referencing the United States Postal Service, the robbery of the Redby Post Office, the movement of funds, or the sale or distribution of narcotics; evidence related to the purchase, use, or deposit of Postal Service money orders; any communications or records related to the sale of narcotics; any communications or records related to Travis Juarez, Defendant Kyle Clark, Kalyssa White, "K.S., J.C., [Defendant Valerie Clark], S.M., or other unknown conspirators"; evidence indicating the state of mind of the user of Device 1 or Device 2 as it related to the crimes under investigation; and evidence that may help identify any unknown co-conspirator, including information related to the whereabouts of said co-conspirator. (Gov't's Ex. 1). In addition to providing the details of the investigation as described above, PI Hoffman's affidavit submitted in support of the February 28, 2020, Search Warrant, also provided a description of PI Hoffman's qualifications and credentials. (Id.).

PI Hoffman attested that based on his training and experience robbery suspects often used cellular telephones as tools in furtherance of their robbery conspiracy. (Id.). PI Hoffman explained that "robbery suspects often use accomplices as lookouts or getaway drivers and communicate with these accomplices through cellular phones" and they also use cellular telephones to conduct pre-robbery surveillance. (Id. at 7). PI Hoffman further attested that, based on his "training and experience and the experience of other investigators who specialize in

narcotics trafficking investigation," individuals involved in narcotics trafficking use cellular telephones to coordinate activities, including the quantities of narcotics to be purchased, the price of said purchase, and how said narcotics will be transported. (Id. at 7–8). PI Hoffman similarly attested that, based on his "training and experience and the experience of other investigators who specialize in narcotics trafficking investigation," individuals involved in narcotics trafficking may use Postal Service money orders to pay for contraband based on a preference for money orders over cash payments; enlist the assistance of multiple persons to purchase money orders on their behalf to avoid United States Department of Treasury reporting requirements; use multiple addresses to receive contraband; and use expedited services, such as Priority Mail and Priority Mail Express, to limit the duration of time the articles remain in the delivery system. (Id. at 11). PI Hoffman further attested that when individuals use these methods for narcotics trafficking, said individuals are often required to submit payments to the seller in advance either through mailing money orders or depositing said money orders into the seller's bank account before the seller will mail the narcotics. (Id. at 11–12). Lastly, PI Hoffman attested that electronic devices are capable of storing information for long periods of time, and such information can be recovered through the use of forensic tools. (Id. at 17–18).

The Honorable Elizabeth Cowan Wright, United States Magistrate Judge for the District of Minnesota, determined that probable cause existed to support the issuance of the February 28, 2020, Search Warrant. (Id.). Thereafter, law enforcement officers attempted to execute this February 28, 2020, Search Warrant.

On April 2, 2020, PI Hoffman submitted an application for a federal search warrant authorizing law enforcement to search for information within the possession of Apple, Inc. related to two iCloud accounts, one allegedly associated with Defendant Kyle Clark and one

allegedly associate with Kalyssa White. (Gov't's Ex. 2).[14] The application sought the disclosure by Apple of all records or other information regarding the identification of the accounts or the identification of devices associated with the accounts; the contents of all emails and instant messages from September 3, 2019, through November 7, 2019, stored on the subject accounts; the content of all files and other records stored in the subject accounts; all activity, connections, and transactional logs for the subject accounts; all records and information regarding the locations where the subject accounts or devices associated with the subject accounts were accessed; all records pertaining to the types of services used; all records pertaining to communications between Apple and any person regarding the account; and all files, keys, or other information necessary to decrypt any data produced in decrypted form. (Id.).

In his affidavit submitted in support of the April 2, 2020, iCloud Search Warrant, PI Hoffman provided the details of the investigation, including all the information provided in his previous affidavit, as described above. (Id.). PI Hoffman also provided information regarding the attempted execution of the February 28, 2020, Search Warrant. (Id. at 13–14). Specifically, PI Hoffman attested that following the issuance of the February 28, 2020, Search Warrant, he powered on Device 1 and Device 2 to discover both devices were passcode protected. (Id.). PI Hoffman further attested that business records obtained from Apple demonstrated that Device 1 was registered to Defendant Kyle Clark on September 3, 2019, and the email address used for the "Apple ID/iCloud account associated with the device was" the first subject iCloud account in his April 2, 2020, affidavit. (Id.). Device 2 was registered to Kalyssa White on October 18, 2019, and the email address used for the "Apple ID/iCloud account associated with the device was" the second subject iCloud account in his April 2, 2020, affidavit. (Id.). PI Hoffman also provided

---

[14] Government's Exhibit 2 is the warrant application, supporting affidavit, and warrant to search the two iCloud accounts. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 2. (Tr. 8).

information regarding Apple and the possible uses of an iCloud account. (Id.). PI Hoffman attested that based on his training and experience the data associated with the subject accounts may help investigators determine the whereabouts of Defendant Kyle Clark and Kalyssa White on the date the Redby Post Office was robbed, as well as, the dates relevant to the packages shipped to and from California; may help law enforcement identify the source of the narcotics found in the GMC Yukon; may contain communications related to the September 4, 2019, robbery; and may reveal evidence related to Defendant Kyle Clark's and Ms. White's knowledge of the robbery, the contents of the relevant packages, and the efforts taken to alter their conspiratorially methods. (Id.).

The Honorable Elizabeth Cowan Wright, United States Magistrate Judge for the District of Minnesota, determined that probable cause existed to support the issuance of the April 2, 2020, iCloud Search Warrant. (Id.). Thereafter, law enforcement officers executed the April 2, 2020, iCloud Search Warrant.

On May 1, 2020, PI Hoffman submitted an application for a federal search warrant to authorize law enforcement to search information associated with two Facebook accounts, an account ending in '3804 and an account ending in '2336. (Gov't's Ex. 3).[15] In "Section I" of "Attachment B" of his application, PI Hoffman specified the information to be disclosed by Facebook. (Id.). Specifically, PI Hoffman sought to require Facebook to disclose the following information for each of the subject Facebook accounts: all contact and personal identification information; all activity logs from September 1, 2019, to April 27, 2020; all photos and videos from September 1, 2019, to April 27, 2020; all profile information; all communications, including pending "Friend" requests from September 1, 2019, to April 27, 2020; all location

---

[15] Government's Exhibit 3 is the warrant application, supporting affidavit, and warrant to search the two Facebook accounts. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 3. (Tr. 8).

information, including physical location and IP logs; all record of the account's usage of the "Like" or "fan" feature; all searches conducted by the account from September 1, 2019, to April 27, 2020; all "lists of friends created by the account"; all information related to the account's "access and use of Facebook Marketplace"; "types of services utilized by the user," including the length of that service and the payment method used; the account settings; and all records pertaining to communications between Facebook and any person regarding the account. (Id.). In "Section II" of "Attachment B" of the application, the application provided that it sought authorization for law enforcement to seize only the following:

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of [18 U.S.C. §§ 2, 641, 2114; 21 U.S.C. §§ 841(a)(1), 843(b), and 846; and 31 U.S.C. § 5324 involving Travis Juarez, Defendant Kyle Clark, Kalyssa White, Othoniel Hernandez Cruz, David Jourdain], K.D., K.S., J.C., [Defendant Valerie Clark], S.M., "Jose Arcega," "Jos Ar," and other known and unknown conspirators from **September 1, 2019, to April 27, 2020**, including for each [subject Facebook account], information pertaining to the following matters:
(a) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;
(b) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;
(c) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s). [sic]
(d) Evidence relating to [Defendant Kyle Clark's and Ms. White's] whereabout on dates relevant to the conspiracy, including the day of the Redby Post Office robbery (September 4, 2019) and the dates which parcels relevant to the investigation were shipped and received . . . ;
(e) Any data, communication, or records referencing the U.S. Postal Service, its employee, the robbery of the Redby Post Office, narcotics purchases, sales, or trafficking, or the movement or distribution of funds;
(f) Evidence related to the purchase, use, transfer, or deposit of U.S. Postal Service money orders;
(g) Evidence related to the transfer of funds, including cash, money orders, money transfer services, or electronic payments;
(h) Evidence related to the shipment, receipt, or tracking of letters, packages, contraband, or other items;

(i) Any data, communication, or records pertaining to the purchase or sale of narcotics, . . . ; [and]
(j) Any communications or records related to subjects [Travis Juarez, Defendant Kyle Clark, Kalyssa White, Othoniel Hernandez Cruz, David Jourdain], K.D., K.S., J.C., [Defendant Valerie Clark], S.M., "Jose Arcega," "Jos Ar," and other known and unknown conspirators.

(Id.) (emphasis in original).

In his affidavit submitted in support of the May 1, 2020, Facebook Search Warrant, PI Hoffman provide the details of the investigation, including all the information contained in his previous affidavits, as described above. (Id.). PI Hoffman's affidavit also contained information regarding the identification of the two subject Facebook accounts. Specifically, PI Hoffman provided that business records from Facebook indicate that the '3804 Facebook account was registered in the name of Defendant Kyle Clark and the '2336 was registered in the name of Kalyssa White. (Id.);

PI Hoffman's affidavit also provided information regarding the execution of the April 2, 2020, Search Warrant for the two iCloud accounts discussed above. He attested that both accounts contained numerous pictures of Defendant Kyle Clark and Ms. White, including pictures depicting Defendant Kyle Clark and Ms. White "in the possession of firearms, large amounts of cash, and drug paraphernalia." (Id.). Both accounts contained "notes" listing tracking numbers for United States Postal Service packages, including two of the packages discussed above which were mailed from California to an address in Red Lake, Minnesota. (Id.). Defendant Kyle Clark's iCloud account also contained a screenshot of a Facebook Messenger conversation with a Facebook user identified as "Jos Ar" in which Defendant Kyle Clark is provided with a specific address for an apartment in Wilmington, California, and the message further provides that "this is the address for the 3400 please." (Id.). PI Hoffman explains that the specific address provided is noteworthy because it is the same address to which two Priority Mail Express

packages believed to contain Postal Service money orders were mailed from Redby, Minnesota, as discussed above. (Id.). United States Postal Service busines records also indicate that two additional Priority Express packages were sent to this specific apartment on October 15, 2019, and October 21, 2019. (Id.). Ms. White's iCloud account also contained a series of screenshots depicting other Facebook Messenger conversations with the Facebook user "Jos Ar," including a conversation in which "Jos Ar" writes "send me 8000 the rest I [sic] for him to help the lawyer." (Id.).

PI Hoffman's affidavit also provided that Ms. White had been arrested on April 26, 2020, following the search of a residence in which law enforcement discovered 2.25 grams of methamphetamine, 0.74 grams of heroin, and 50 fentanyl pills. (Id.). Law enforcement officers also located 465 fentanyl pills in a safe hidden in an off-site location. (Id.).

In his affidavit, PI Hoffman also provided information regarding the functionality of Facebook in regard to search warrants. (Id.). PI Hoffman attested that "[u]pon receipt of the information described in Section I of Attachment B, government-authorized persons [would] review that information to locate the items described in Section II of Attachment B." (Id.).

The Honorable Tony N. Leung, United States Magistrate Judge for the District of Minnesota, determined that probable cause existed to support the issuance of the May 1, 2020, Facebook Search Warrant. (Id.). Thereafter, law enforcement officers executed the May 1, 2020, Facebook Search Warrant.

On July 24, 2020, PI Hoffman submitted another application for a federal search warrant to authorize law enforcement to search information associated with twenty separate Facebook accounts, including, as pertinent here, Facebook accounts '4263 in the name of "Val Clark" referred to as "SUBJECT ACCOUNT 4," in PI Hoffman's affidavit, and Facebook account

'0018 in the name of "Drew Graves," referred to as "SUBJECT ACCOUNT 19," in PI Hoffman's affidavit. (Gov't's Ex. 4).[16] "Section I" and "Section II" of "Attachment B" of PI Hoffman's July 24, 2020, application are substantively identical to the corresponding sections in PI Hoffman's May 1, 2020, affidavit, except PI Hoffman's July 24, 2020, affidavit provided a temporal limitation of August 1, 2019, to April 30, 2020, and provided the names of additional alleged coconspirators, including Defendant Graves. (Id.).

In his affidavit submitted in support of the July 24, 2020, Facebook Search Warrant, PI Hoffman provide the details of the investigation, including all the information contained in his previous affidavits, as described above. (Id.). PI Hoffman's affidavit also contained information regarding the identification of the subject Facebook accounts. Specifically, PI Hoffman provided the following information regarding the two relevant accounts. Regarding Facebook account '4263 in the name of "Val Clark," PI Hoffman attest that he compared Defendant Valerie Clark's Minnesota driver's license photograph with photographs publicly viewable on the '4263 account to find that Defendant Valerie Clark was the female predominately depicted in the photographs. (Id. at 30). Regarding Facebook account '0018 in the name of "Drew Graves," PI Hoffman conducted the same photograph comparison as with the '4263 account to find that Defendant Graves was the male individual predominately depicted in the photographs on the '4263 account suggesting that Defendant Graves controls Facebook account '4263. (Id.).

PI Hoffman's affidavit also provided information regarding the execution of the May 1, 2020, Facebook Search Warrant discussed above. PI Hoffman attested that records obtained from Ms. White's Facebook account showed "extensive communications" with Defendant Valerie Clark's Facebook account, the '4263 account, including one December 3, 2019, conversation in

---

[16] Government's Exhibit 4 is the warrant application, supporting affidavit, and warrant to search the twenty Facebook accounts. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 4. (Tr. 8).

which Defendant Valerie Clark tells Ms. White that Defendant Valerie Clark "got them numbers" for "that $$." (Id.). PI Hoffman attested that this "numbers" reference "may be related to two money transfers [Defendant Valerie Clark] made to individuals in the Mexican state of Baja, California (the same area Jose ARCEGA-VEJAR resides), on December 2, 2019." (Id.). Specifically, on December 2, 2019, Defendant Valerie Clark sent two $1,000.00 money transfers to two residence of Baja California, Mexico, and each of these transfers created a unique reference number. (Id.).

PI Hoffman attested that based on his training and experience he know that individuals involved in sending money transfers in furtherance of criminal activity are often required to provide transaction reference numbers for counterparties to retrieve the funds. (Id.). He further attested that based on his training and experience he believed that data contained in Facebook account '4263 may reveal evidence of Defendant Valerie Clark's role in the alleged narcotics conspiracy, e.g., sending funds to Mexican nationals to purchase narcotics. (Id. at 31).

The execution of the May 1, 2020, Facebook Search Warrant also revealed records related to the Defendant Kyle Clark's and Ms. White's Facebook accounts showing correspondence with Facebook account '0018 in the name of "Drew Graves." (Id.). In his affidavit, PI Hoffman characterized the conversations as "regarding the sale of narcotics," and he provided a transcript of these electronic conversations. (Id. at 52–55). These conversations include references to "jose arcega vejar," "loot," baja california," and "mexico." (Id.). PI Hoffman attested that based on his training and experience he believed that data contained in Facebook account '0018 may reveal evidence of Defendant Graves's role in the alleged narcotics conspiracy. (Id.).

The Honorable Elizabeth Cowan Wright, United States Magistrate Judge for the District of Minnesota, determined that probable cause existed to support the issuance of the July 24, 2020, Facebook Search Warrant. (Id.). Thereafter, law enforcement officers executed the July 24, 2020, Facebook Search Warrant.

On September 10, 2020, PI Hoffman submitted another application for a federal search warrant to authorize law enforcement to search information associated with various Facebook account, including Facebook account '6625 which PI Hoffman believed was associated with Defendant Graves. (Gov't's Ex. 5).[17] "Section I" and "Section II" of "Attachment B" of PI Hoffman's September 10, 2020, application are identical to the corresponding sections in PI Hoffman's July 24, 2020, affidavit, as described above. (Id.). In his affidavit submitted in support of the September 10, 2020, Facebook Search Warrant, PI Hoffman included all of the details of the investigation, including all the information contained in his previous affidavits.

PI Hoffman's affidavit also provided additional information regarding Jose Arcega-Vejar. (Id.). In 2015, Mr. Arcega-Vejar was identified as a methamphetamine courier operating in Los Angeles, and when he was arrested on August 11, 2015, he was in the possession of twelve pounds of methamphetamine. (Id.). He was later convicted of federal narcotics charges and sentenced to a fifty-one-month term of imprisonment to be followed by a five-year term of supervised release. (Id.). He was released from custody on April 24, 2019. (Id.). PI Hoffman also provided additional excerpts from Facebook Messenger conversations between Mr. Arcega-Vejar and Defendant Kyle Clark, as well as, Facebook Messenger conversations between Mr. Arcega-Vejar and Ms. White. These conversation excerpts reference the same topics as the previous Facebook Messenger conversations discussed above; the addresses to which various

---

[17] Government's Exhibit 5 is the warrant application, supporting affidavit, and warrant to search the five Facebook accounts. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 5. (Tr. 8).

packages will be sent; the price of "a pill"; and the total price to be paid. (Id.). PI Hoffman also attested that based on his training and experiences the conversations constituted evidence that Mr. Arcega-Vejar was the source of narcotics in the presently alleged conspiracy. (Id.).

PI Hoffman also provided excerpts of Facebook Messenger conversations between Defendant Kyle Clark and Defendant Graves which PI Hoffman described as "regarding the purchase of narcotics." (Id.). These conversations were recovered from Defendant Graves's '0018 Facebook account which was one of the accounts discussed above in the July 24, 2020, Facebook Search Warrant. (Id.). PI Hoffman attested that based on his training and experience the messages constitute evidence that Defendant Graves's played a role in the alleged narcotics conspiracy, including sending funds to Mr. Arcega-Vejar for the purchase of narcotics. (Id.).

PI Hoffman's affidavit also provided additional information from interviews conducted after the April 23, 2020, search of the residence in Red Lake, Minnesota which resulted in Ms. White's arrest, as already discussed above. (Id.). The affidavit provided that the location of the "hidden safe" had been provided by a named-cooperating defendant who had also provided that he and other individuals had been selling pills for Ms. White with who he communicated via Facebook Messenger. (Id.). PI Hoffman attested that the same investigation following Ms. White's arrest had determined that Ms. White "received the pills though a package sent from California via USPS Priority Mail," and Ms. White's family members confirmed that Ms. White took possession of the parcel. (Id.).

PI Hoffman's affidavit also provides transcripts of conversations in which Ms. White relayed messages to various alleged co-conspirators regarding instructions on how to conceal funds during the mailing process, and he attests that other Facebook records show "extensive conversations" with an alleged co-conspirator regard narcotics Mr. Arcega-Vejar arranged to

send Ms. White. (Id. at 24–28). In one conversation between Ms. White and the other alleged co-conspirator regarding "a thousand pills," Ms. White tells the alleged co-conspirator that the supplier is only sending them the pills "to get his money back from what [K]yle, Drew, and [C]orey fucked up." (Id. at 30).

PI Hoffman also attested that business records related to the Facebook account of Mr. Arcega-Vejar showed involvement with a second Facebook account, the '6625 account, in the name of "Dru Gra . . ." which PI Hoffman believed to be Defendant Graves. (Id.) (ellipsis in original). Regarding this '6625 Facebook account, PI Hoffman attested that the "Dru Gra . . ." account was created approximately one month after Defendant Kyle Clark was arrested. (Id.). PI Hoffman provided a screenshot—found in the search of Mr. Arcega-Vejar's Facebook account—which contains a portion of a conversation between Mr. Arcega-Vejar and the '6625 Facebook Account; Mr. Arcega-Vejar had sent the screenshot to another Facebook user. In the conversation the parties reference California and mailing packages. PI Hoffman attested that the conversation contained similar language to the conversations Mr. Arcega-Vejar had with Defendant Kyle Clark and Ms. White. (Id.). PI Hoffman also noted that "Dru Gra . . ." is phonetically similar to Drew Graves, and PI Hoffman knew based on his training and experience that a Facebook user may change the name on their account at any time. (Id.). PI Hoffman further attested based on his training and experience that data contained with the '0018 Facebook account "may reveal evidence of" Defendant Graves's "role in receiving narcotics shipments from [Mr. Arcega-Vejar] following [Defendant Kyle Clark's] arrest." (Id.).

PI Hoffman further attested that based on his training and experience he believed that information from Facebook account '6625 may contain incriminating conversations and evidence which Mr. Arcega-Vejar deleted from his Facebook account. For example, the

information provided in the execution of the Search Warrant on Mr. Arcega-Vejar's Facebook account did not contain direct evidence of any communication between Mr. Arcega-Vejar's Facebook account and Facebook account '6625; however, Mr. Arcega-Vejar's Facebook account did send to another Facebook account a screenshot of a conversation between Mr. Arcega-Vejar's Facebook account and Facebook account '6625. (Id. at 31). This indicates that the conversation between Mr. Arcega-Vejar's Facebook account and Facebook account '6625 was deleted from Mr. Arcega-Vejar's Facebook account. (Id.). Again based on his training and experience, PI Hoffman attested that although individuals using communication platforms such as Facebook Messenger in the furtherance of criminal activity may delete incriminating messages, those messages may continue to exist on the corresponding party's Facebook account. (Id.).

The Honorable Elizabeth Cowan Wright, United States Magistrate Judge for the District of Minnesota, determined that probable cause existed to support the issuance of the September 10, 2020, Facebook Search Warrant. (Id.). Thereafter, law enforcement officers executed the September 10, 2020, Facebook Search Warrant. (Id.).

## II.   Defendant Kyle Clark's Motion for Disclosure of Confidential Informants. [Docket No. 122].

Defendant Kyle Clark's Motion for Disclosure of Confidential Informants, [Docket No. 122], seeks the immediate disclosure of the identity of all informants used in the investigation of this case regardless of whether or not said informants will be called as a witness by the Government at trial. Defendant Kyle Clark references a specific individual who provided CI Leyba with information that "a Maroon GMC Yukon with nice rims is supposed to be dealing large amounts of narcotics and making drops . . . ." (Def.'s Mot., [Docket No. 122], at 2). In support of this request, Defendant Kyle Clark asserts that the "informant's identify [sic] and

favorable testimony is important to establish [his] available defenses, namely that he was not a narcotic's dealer, was not present during certain drop offs, and most certainly was not the leader" of the alleged conspiracy. (Def. Mem., [Docket No. 184], at 15). Defendant Kyle Clark also conclusorily asserts that "[p]retrial disclosure of the informant will be helpful to [his] trial strategy, the standard [he] must and do[es] meet." (Id.).

In its written response, the Government opposes Defendant Kyle Clark's request for the disclosure of the confidential information here. Although the Government acknowledges that an individual provided information to law enforcement in the present case, the Government contends that said person provided information only regarding a vehicle and said person did not provide any information regarding Defendant Kyle Clark. (Gov't Mem., [Docket No. 195], at 19–20). The Government argues that under the circumstance of the present case Defendant Kyle Clark cannot demonstrate a sufficient need for the disclosure of said informant.

Under the tenant of law referred to as the "Informer's Privilege," the Government is permitted "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." Roviaro v. United States, 353 U.S. 53, 59 (1957) (citations omitted). There are, however, several well-established exceptions to this privilege. Id. Of those, the one most pertinent to the present case takes into account the "fundamental requirements of fairness" and a defendant's need to prepare an adequate defense. See, Id. at 60–61 ("Where the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.").

"[T]here is no litmus test for determining when disclosure [of an informant's identity] is required[.]" United States v. Lapsley, 334 F.3d 762, 764 (8th Cir. 2003); see also, Roviaro, 353

at 62 ("We believe that no fixed rule with respect to disclosure is justifiable."). However, the Eighth Circuit has indicated a Court ruling on a motion for disclosure of an informant's identity "must weigh the defendant's right to information against the government's privilege to withhold the identity of its confidential informants." Lapsley, 334 F.3d at 763–64 (internal quotation marks and citations omitted).

The defendant bears the burden of demonstrating that the disclosure of an informant's identity is "material to the outcome of his case; in other words, that disclosure is vital to ensure a fair trial." United States v. Gonzalez-Rodriguez, 239 F.3d 948, 951 (8th Cir. 2001). If, for example, the informant is an active participant in the conduct charged, the informant's identity is "almost always" material. United States v. Sanchez, 429 F.3d 753, 756 (8th Cir. 2005). If, on the other hand, the informant is a mere "tipster," there is generally a strong presumption against disclosure. United States v. Lindsey, 284 F.3d 874, 877 (8th Cir. 2002).

On the record now before the Court, the informant in the present case was a mere "tipster." See, United States v. Gonzalez-Rodriguez, 239 F.3d 948, 951 (8th Cir. 2001) (defining "tipster" as "someone who conveys information to the government but who does not participate in the offense"). The informant here provided law enforcement officers with only a description of a vehicle which the informant believed to be involved in the trafficking of narcotics. There is no indication on the record now before the Court that the informant provided law enforcement with any information regard the persons in said vehicle. Further, the record now before the Court lacks any indication that said informant participated in any conduct charged in the present Indictment.

Defendant Kyle Clark has failed to overcome the strong presumption against disclosure of a tipster's identity. In fact, Defendant Kyle Clark has failed to present any legal or factual

argument as to why the identity of this tipster is needed to aid Defendant Kyle Clark in his defense in the present case.

Defendant Kyle Clark does assert that he is "not seeking the identify [sic] of a tipster." (Def.'s Mem., [Docket No. 184], at 15). In support of this assertion, Defendant Kyle Clark argues that the informant's identity is important to establish his "available defense, namely that he was not a narcotic's dealer, was not present during certain drop offs, and most certainly was not the leader [of] an overarching conspiracy . . . ." (Def.'s Mem., [Docket No. 184], at 15). This argument is unpersuasive because it is wholly unsupported by the record and based on a mischaracterization of the record. As Defendant Kyle Clark acknowledges, the informant provided information regarding a Maroon GMC Yukon with nice rims which the informant believed to be involved in the trafficking of narcotics. (Def.'s Mot., [Docket No. 122], at 2; Joint Letter [Docket No. 180]). And as already discussed above, there is no indication on the record that the informant provided any information regarding Defendant Kyle Clark or his involvement regarding the conduct alleged in the present Indictment.

Further, it does not appear that the Government intends to call the tipster to testify at trial.[18] The Court concludes that Defendant Kyle Clark has failed to overcome the strong presumption against the disclosure of the tipster's identity in the present case.

Therefore, Defendant's Motion for Disclosure of Confidential Informants, [Docket No. 122], is **DENIED**. The Government is not required at this time to disclose the identity of the confidential informant unless the informant's identity is discoverable under <u>Brady</u> and its progeny, or the Government's other discovery obligations.

---

[18] If the Government later determines that it will call the present informant as a witness at trial, then said informant should be identified and made available to the Defense before trial.

III.   **Defendant Kyle Clark's Motion to Suppress Searches and Seizures. [Docket No. 125].**

Defendant Kyle Clark next seeks to suppress all evidence flowing from November 2, 2019, search of the GMC Yukon. In support of this request, Defendant Kyle Clark argues that the November 2, 2019, search of his vehicle following the November 2, 2019, traffic stop was conducted in violation of Rodriguez v. United States, 575 U.S. 348 (2015).

Defendant Kyle Clark also seeks to suppress the evidence flowing from the execution of the following search warrants: the November 7, 2019, Tribal Search Warrant; the February 28, 2020, Search Warrant; the April 2, 2020, iCloud Search Warrant; the May 1, 2020, Facebook Search Warrant; and the July 24, 2020, Facebook Search Warrant. (Def.'s Mem., [Docket No. 184], at 5, 12). Defendant Kyle Clark contends that the evidence flowing from these Search Warrants should be suppressed because each Search Warrant is based on tainted evidence, i.e., evidence found during the November 2, 2019, search of the GMC Yukon which he presently challenges. (Id. at 14). Defendant Kyle Clark also contends that the Search Warrants each lacks a nexus between the place or items to be searched and the "specific crime [he] is said to have committed . . . ." (Id. at 13).

   **A.  Standard of Review**

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)).

The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Wiley, No. 09-cr-239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (quoting United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005)) (alterations in Wiley). In addition, the issuing court's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had a 'substantial basis for . . .

conclud[ing]' that probable cause existed." <u>Id.</u> at 238–39 (quoting <u>Jones v. United States</u>, 362 U.S. 257, 271 (1960)).

### B. November 2, 2019, Traffic Stop and Search of GMC Yukon

As observed above, Defendant Kyle Clark moves this Court for an Order suppressing all evidence obtained during the roadside search of the GMC Yukon during the traffic stop on November 2, 2019. (Def.'s Mem. [Docket No. 184]). In support of this request, Defendant Kyle Clark ostensibly challenges the November 2, 2019, traffic stop of the GMC Yukon,[19] and he argues that the traffic stop was impermissible prolonged. (<u>Id.</u> at 4–12).

As observed above, "[t]he Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." <u>United States v. Jones</u>, 269 F.3d 919, 924 (8th Cir. 2001) (quoting U.S. Const. amend. IV). Roadside traffic stops constitute seizures for the purposes of the Fourth Amendment. <u>See, e.g.</u>, <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979). To be lawful, a traffic stop must be supported at least by a reasonable, articulable suspicion that a crime is being committed. <u>Jones</u>, 269 F.3d at 924 (citing <u>Prouse</u>, 440 U.S. at 663). The Eighth Circuit Court of Appeals has repeatedly held that any traffic violation, no matter how minor, will provide at least a reasonable, articulable basis to justify a traffic stop. <u>See, e.g.</u>, <u>United States v. Houston</u>, 548 F.3d 1151, 1153 (8th Cir. 2008).

Once a stop has been lawfully initiated, the officer is entitled to conduct an investigation, the scope of which must be reasonably related to the circumstance which give rise to the stop.

---

[19] Although Defendant Kyle Clark acknowledges that a traffic violation can justify a traffic stop and that Officer Bendel observed the GMC Yukon violating the legal speed limit, his memorandum contains enough obscure references attempting to undermining the justification for the traffic stop that it is unclear whether or not Defendant Kyle Clark challenges the November 2, 2019, traffic stop. (<u>See, e.g.</u>, Def. Mem., [Docket No. 184], at 5) (acknowledging that a traffic violation can justify a stop but then providing that "[t]he motions hearing was never going to be about a speeding ticket."). Thus, in an abundance of caution, the Court addresses the constitutionality of the November 2, 2019, traffic stop itself.

Rodriguez v. United States, 575 U.S. 348, 353 (2015). A court reviewing the validity of an initial stop examines whether an officer's actions were objectively reasonable under the circumstances known to the officer at the time. United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005).

A traffic stop generally must be supported by at least reasonable, articulable suspicion that criminal activity has occurred or is taking place. United States v. Martin, 411 F.3d 993, 1000 (8th Cir. 2005). A traffic violation, however minor, is sufficient to justify an initial stop of a vehicle. Martin, 411 F.3d at 1000; see, e.g., United States v. Travis, No. 14-cr-253 (DSD/SER), 2015 WL 439393, at *1, 11 (D. Minn. Feb. 3, 2015); United States v. Maurstad, No. 18-cr-300 (1) (SRN/KMM), 2019 WL 4863451, at *3 (D. Minn. Aug. 21, 2019), report and recommendation adopted, 2019 WL 4862029 (D. Minn. Oct. 2, 2019). "This is true even if a valid traffic stop is a pretext for another investigation." United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002).

In the present case, it is unrefuted that at the time of the November 2, 2019, traffic stop of the GMC Yukon the GMC Yukon was travelling in excess of the speed limit in violation of the law. At the June 10, 2021, Motions Hearing, Officer Bendel testified that he paced the GMC Yukon as driving at between 40 and 45 miles per hour, in an area where the legal speed limit was 25 miles per hour. When  Officer Bendel initially spoke with Defendant Kyle Clark he admitted to travelling in excess of the speed limit, stating that he believed he was going 35 miles per hour. Therefore, on the record now before the Court, Officer Bendel possessed, at least, a reasonable, articulable basis to conduct the initial November 2, 2019, traffic stop of the GMC Yukon. Thus, the initiation of November 2, 2019, traffic stop was therefore constitutionally permissible.

Defendant Kyle Clark also contends that the November 2, 2019, traffic stop was impermissible prolonged. In support of this contention, Defendant Kyle Clark argues that Officer

Bendel lacked reasonable, articulable suspicion to extend the traffic stop. Defendant Kyle Clark's argument here is unpersuasive, and it fails to take into account the totality of the circumstances.

The Eighth Circuit Court of Appeals has consistently held that during a lawful traffic stop, a police officer may conduct an investigation reasonably related in scope to the circumstances that justified the stop. United States v. Barragan, 379 F.3d 524, 528 (8th Cir. 2004). "The officer may also question the car's occupants about their destination and itinerary." United States v. Anguiano, 795 F.3d 873, 876 (8th Cir. 2015); see, United States v. Linkous, 285 F.3d 716, 719 (8th Cir.2002).

Moreover, an officer conducting a traffic stop who discovers information leading to reasonable suspicion of an unrelated crime may extend the stop and broaden the investigation. United States v. Anguiano, 795 F.3d 873, 876 (8th Cir. 2015). However, in the absence of reasonable suspicion, police may not extend an otherwise-completed traffic stop in order to conduct a dog sniff. See, Rodriguez, 575 U.S. at 353. The question, then, is whether Office Bendel had reasonable suspicion to extend the traffic stop. If he lacked reasonable suspicion to expand the scope of the investigation, then the extension of the stop would be unreasonable. See, Id. at 1613, 1616. (holding that, absent reasonable suspicion, seven- or eight-minute extension of traffic stop in order to conduct drug sniff violated Fourth Amendment). If Officer Bendel had reasonable suspicion to justify expanding the scope of the investigation, however, the extension of the stop would not violate the Fourth Amendment. See, e.g., United States v. Maltais, 403 F.3d 550, 556–58 (8th Cir. 2005); United States v. White, 42 F.3d 457, 460 (8th Cir. 1994). "A reasonable suspicion is 'some minimal, objective justification' for

suspicion beyond an 'inchoate hunch.'" United States v. Davis, 943 F.3d 1129, 1132 (8th Cir. 2019) (quoting United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004)).

To establish reasonable suspicion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" further investigation. Terry v. Ohio, 392 U.S. 1, 21 (1968). The concept of reasonable suspicion is "not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213 (1983). Instead, when determining whether reasonable suspicion exists, Court must consider the totality of the circumstances. United States v. Woods, 747 F.3d 552, 556 (8th Cir. 2014).

As observed above, Defendant Kyle Clark contends that, even if the initial stop was lawful, it became unlawful when Officer Bendel unreasonably extended the stop past the point at which Officer Bendel concluded all tasks related to the initial stop by providing Defendant Kyle Clark with the speeding ticket.[20] In support, Defendant Kyle Clark relies on Rodriguez v. United States, 135 S. Ct. 1609 (2015).

In Rodriguez, a canine-paired officer stopped Rodriguez for driving on the shoulder, a traffic violation. Rodriguez v. United States, 575 U.S. 348 (2015). After the officer completed all tasks relating to the basis for the stop, he asked Rodriguez for permission to allow his dog to conduct a sniff-search of the exterior of Rodriguez's vehicle. Id. Rodriquez did not consent. Id. The officer then detained Rodriguez for approximately an additional seven minutes while he waited for a second officer to arrive, then retrieved his dog and conducted a sniff-search of the

---

[20] Defendant Kyle Clark's argument here is based, at least in part, on an incorrect assumption regarding the factual records now before the Court. Defendant Kyle Clark that the traffic stop should not have extended beyond "the issuance of a speeding ticket." (Def.'s Mem., [Docket No. 184], at 8). The record, however, does not indicate when Officer Bendel gave Defendant the ultimately issued speeding ticket. There is certainly no indication that Officer Bendel issued Defendant Kyle Clark the speeding ticked before the November 2, 2019, roadside search of the GMC Yukon.

exterior of the vehicle, during which the dog indicated the presence of narcotics in the vehicle. Id. As a result, Rodriquez was indicted on narcotics charges. Id. He later moved to suppress the evidence gathered as a result of the stop. Id. The Magistrate Judge recommended that the motion be denied, concluding that although the officer did not have a reasonable articulable suspicion on which to prolong the stop after completing all tasks related to the initial stop, the seven-minute extension of the stop was a de minimis intrusion on Rodriguez's Fourth Amendment rights. Id. The district court and the Eighth Circuit agreed. Id. at 1614. The Supreme Court, however, reversed, holding that the officer had been required to have a separate reasonable articulable suspicion of criminal activity to extend the stop past the point at which he had completed all tasks related to the initial traffic stop. Id. at 1615.

The present case is distinguishable from the facts of Rodriguez. In Rodriguez, the Magistrate Judge had concluded that the officer did not have any objectively reasonable articulable suspicion of further criminal activity beyond the initial basis for the traffic stop when he further detained Rodriguez. Here, in contrast Officer Bendel learned articulable specific facts, including additional facts he learned during the traffic stop. These observations gave rise to an objectively reasonable suspicion that Defendant Kyle Clark was engaged in additional criminal activity beyond merely travelling in excess of the legal speed limit. Specifically, Officer Bendel observed the GMC Yukon travel to two separate residences suspected of narcotics activities, observed persons travelling two and from the GMC Yukon while it was parked behind on of these residences; received inconsistent responses from Defendant Kyle Clark regarding his destination; observed Defendant Kyle Clark's extremely nervous behavior; previously received information from CI Leyba that a vehicle with a description matching the GMC Yukon was involved in the trafficking of narcotics; and Defendant Kyle Clark fled from the traffic stop.

The Eighth Circuit Court of Appeals has held that an individual's nervousness is appropriate to consider in support of reasonable articulable suspicion. See, e.g., United States v. Sanchez, 417 F.3d 971, 976 (8th Cir. 2005); United States v. Pacheco, 996 F.3d 508, 512 (8th Cir. 2021). In the present case, Defendant Kyle Clark initially stated that he was travelling to Redby, Minnesota, even though he was travelling down a dead-end road in the opposite direction of Redby, Minnesota. When Officer Bendel again asked Defendant Kyle where he was driving Defendant Kyle Clark stated that he was "driving around." Defendant Kyle Clark's "extreme nervousness" also supports Officer Bendel's reasonable articulable suspicion to extend the traffic stop. See, e.g., Pacheco, 996 F.3d at 512 ("We have previously found reasonable suspicion to detain a vehicle's occupants in part because of their vague and confusing answers to routine questions about travel plans"); United States v. Martin, 988 F.3d 1034, 1041–42 (8th Cir. 2021); United States v. Sanchez, 417 F.3d 971, 976 (8th Cir. 2005). Likewise, Defendant Kyle Clark's inconsistent stories regarding his destination support finding that Officer Bendel had reasonable articulable suspicion to extend the November 2, 2019, traffic stop. See, e.g., Anguiano, 795 F.3d at 876; Pacheco, 996 F.3d at 512. Defendant Kyle Clark's running from the scene of the traffic stop also supports finding Officer Bendel possessed reasonable articulable suspicion to extend the November 2, 2019, traffic stop. See, e.g., United States v. Mosley, No. 14-cr-3030-MWB, 2014 WL 5454575, at *17 (N.D. Iowa Oct. 27, 2014); Illinois v. Wardlow, 528 U.S. 119, 124 (2000); United States v. Tate, No. 4:11-cr-00169 (RWS/NAB), 2011 WL 3607896, at *3 (E.D. Mo. July 28, 2011), report and recommendation adopted, 2011 WL 3608002 (E.D. Mo. Aug. 12, 2011).

Based on the record now before the Court, the undersigned finds that the November 2, 2019, traffic stop itself passes constitutional muster.

The Court must still consider the constitutional permissibility of the roadside search of the GMC Yukon conducted during the November 2, 2019, traffic stop.

"The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (quoting U.S. Const. amend. IV). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. Unites States, 389 U.S. 347, 357 (1967)). One of these exceptions is the "automobile exception." United States v. Williams, 616 F.3d 760, 764 (8th Cir. 2012).

"[T]he 'automobile exception' permits the warrantless search of a vehicle if the police 'had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began.'" United States v. Vore, 743 F.3d 1175, 1179 (8th Cir. 2014) (quoting United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003)). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005). In making the probable cause determination, Courts "apply a common sense approach and consider all relevant circumstances." Id. "[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003).

Items viewed by law enforcement officers in plain view inside an automobile can support the formation of probable cause. See, e.g., United States v. Mayo, 627 F.3d 709, 713–14 (8th Cir. 2010). Under the plain view doctrine, a law enforcement officer "may seize, without a warrant, an item that is 1) in plain view 2) when it is observed from a lawful vantage point, where the incriminating character of the item is immediately apparent." United States v. Banks, 514 F.3d 769, 773 (8th Cir. 2008) (footnote omitted) (citing Horton v. California, 496 U.S. 128, 136–38 (1990)); United States v. Armstrong, 554 F.3d 1159, 1162–63 (8th Cir. 2009), cert. denied, 129 S.Ct. 2805 (2009).

In the present case, all of the circumstances discussed above in relation to Officer Bendel's reasonable articulable suspicion to extend the November 2, 2019, traffic stop continue here to support probable cause under the automobile exception, including Defendant Kyle Clark's extremely nervous behavior, his conflicting and contradictory explanation regarding his travel, and Defendant Kyle Clark's flight from the scene of the traffic stop. See, e.g., United States v. Mayo, 627 F.3d 709, 713–14 (8th Cir. 2010) (collecting cases). Officer Bendel's observation of "burned tin foil" also lend substantial support in favor of a finding of probable cause, if Officer Bendel observed said tin foil in accordance with the plain view doctrine.

Here, Officer Bendel's observation of the burned tin foil falls squarely within the plain view exception. Officer Bendel approached the passenger's side of the GMC Yukon during a lawful traffic stop which the undersigned has already determined was of a constitutionally permissible nature. "Once an officer has lawfully stopped a vehicle, . . . he can approach it even if all the occupants have been removed." United States v. Vinson, 805 F.3d 1150, 1152 (8th Cir. 2015) (citing United States v. Beatty, 170 F.3d 811, 814 (8th Cir.1999)). Shinning his flashlight

into the rear seat, Officer Bendel was able to see the burned tin foil with a burnt residue.[21] He observed said tin foil without entering the vehicle or moving any object which obstructed his view of the burned tin foil.

Similarly, the incriminating nature of the burned tin foil was also immediate apparent. "'Immediately apparent' means that the officers have probable cause to associate the object with criminal activity." United States v. Darr, 661 F.3d 375, 379 (8th Cir. 2011) (citing United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995)). Officer Bendel testified at the Motions Hearing that based on his training and experience the burned tin foil was indicative of narcotics use, and the Eighth Circuit Court of Appeals has noted the incriminating nature of burnt tin foil. See, e.g., United States v. Allen, 40 F. App'x 313, 315 (8th Cir. 2002) (observing that "burnt tin foil" is "consistent with methamphetamine consumption"); United States v. Alatorre, 863 F.3d 810, 815–16 (8th Cir. 2017) (discussing the "incriminating character of the drug paraphernalia" is "immediately apparent"). On the record now before the Court, the incriminating nature of the burnt tin foil with dark residue was immediately apparent.

For these reasons, Officer Bendel's observation of the burned tin foil falls squarely within the plain view exception. See, e.g., Banks, 514 F.3d at 773; Horton, 496 U.S. at 136–38; Armstrong, 554 F.3d at 1162–63.

As soon as Officer Bendel observed the burnt tin foil in the rear passenger seat of the GMC Yukon, Officer Bendel had the requisite probable cause to search the GMC Yukon under the automobile exception. See, e.g., United States v. Smith, 990 F.3d 607, 612 (8th Cir.

---

[21] To the extent Defendant Kyle Clark argues that Officer Bendel was not permitted to shine his flashlight into the GMC Yukon, that argument has been consistently and repeatedly rejected by the Courts. See, e.g., United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995); United States v. Head, No. 11-cr-89 (RHK/LIB), 2011 WL 2912863, at *1 (D. Minn. May 10, 2011), report and recommendation adopted, 2011 WL 2888156 (D. Minn. July 18, 2011); United States v. Brown, No. 9-cr-145 (JNE/RLE), 2009 WL 2982934, at *11 (D. Minn. Sept. 14, 2009), aff'd 653 F.3d 656 (8th Cir. 2011); United States v. Sanchez, 955 F.3d 669, 677 (8th Cir. 2020), reh'g denied (May 29, 2020), cert. denied, 141 S.Ct. 930 (2020).

2021), reh'g denied (Apr. 27, 2021). This gave Officer Bendel probable cause to search the entire vehicle for narcotics and narcotics paraphernalia. Smith, 990 F.3d at 612; United States v. Olivera-Mendez, 484 F.3d 505, 512 (8th Cir. 2007); United States v. Ross, 456 U.S. 798, 825 (1982). Therefore, the limited roadside search of GMC Yukon during the November 2, 2019, traffic stop was constitutionally permissible under the automobile exception.

Therefore, to the extent Defendant Kyle Clark's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing all evidence located during and subsequently flowing from the November 2, 2019, traffic stop, and roadside search of the GMC Yukon, the undersigned recommends that Defendant Kyle Clark's Motion to Suppress Search and Seizure, [Docket No. 125], be **DENIED**.

### C. Search Warrants

Defendant Kyle Clark collectively challenges the following Search Warrants: the February 28, 2020, Search Warrant; the April 2, 2020, iCloud Search Warrant; the May 1, 2020, Facebook Search Warrant; and the July 24, 2020, Facebook Search Warrant. (Def.'s Mem., [Docket No. 184], at 5, 12).[22] Specifically, Defendant Kyle Clark argues that each of these

---

[22] Defendant Kyle Clark also conclusorily challenges the second search of the GMC Yukon pursuant to the November 7, 2019, Tribal Search Warrant generally arguing that evidence obtained in this second search must be suppressed because CI Leyba's affidavit submitted in support of the November 7, 2019, Tribal Search Warrant authorizing said search lacks a showing of probable cause. Defendant Kyle Clark also contends that any information obtained as a result of the November 2, 2019, roadside search included in the subsequent warrant application is tainted and when properly excised, the affidavit in support of the November 7, 2019, Tribal Search Warrant lacks probable cause. The Court has, however, already determined that Officer Bendel permissibly searched the GMC Yukon roadside on November 2, 2019, pursuant to the automobile exception, and therefore, law enforcement was not required to obtain the subsequent November 7, 2019, Search Warrant to complete the search of the GMC Yukon. See, e.g., United States v. Holleman, 743 F.3d 1152, 1158 (8th Cir. 2014). Because the Court has determined that the November 2, 2019, roadside search was permissible under the automobile exception, the Court need not examine or review the November 7, 2019, Tribal Search Warrant authorizing law enforcement to continue the search of the GMC Yukon, nor address Defendant Kyle Clark's arguments directed at that search warrant because the search warrant was superfluous. See, e.g., Id.; United States v. Brown, No. 9-cr-145(JNE/RLE), 2009 WL 2982934, at *12 n. 22 (D. Minn. Sept. 14, 2009), aff'd, 653 F.3d 656 (8th Cir. 2011). Law enforcement was constitutionally permitted to search the GMC Yukon on November 7, 2019, pursuant to the automobile exception even though said search occurred five days after the November 2, 2019, initial traffic stop. See, e.g., United States v. Rodriguez, 414 F.3d 837, 844 (8th Cir. 2005) ("[P]robable cause existed to search the entire vehicle, and a search pursuant to the automobile exception to the Fourth Amendment may take place at a separate place and time.") (citing United States

Search Warrants lacks a nexus between the item or location to be search "and a specific crime [he] is said to have committed . . . ." (Def.'s Mem., [Docket No. 184], at 13).[23] Defendant Kyle Clark also makes passing references to these Search Warrants being unsupported by probable cause. The Court finds Defendant Kyle Clark's arguments to be unpersuasive.

Before reaching the merits of Defendant Kyle Clark's individual challenges to the search warrants themselves, the Court must first address the threshold issue of standing. Defendant Kyle Clark may <u>only</u> challenge a search warrant for which he has standing to challenge.

As observed above, the Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. However, Fourth Amendment rights are personal, and therefore, they may not be asserted vicariously. <u>United States v. Barragan</u>, 379 F.3d 524, 529 (8th Cir. 2004) (citing <u>Rakas v. Illinois</u>, 439 U.S. 128, 133–34 (1978)).

"An individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" <u>Barragan</u>, 379 F.3d at 529 (citing <u>Minnesota v. Carter</u>, 525 U.S. 83, 88 (1998)); <u>Rakas</u>, 439 U.S.

---

v. <u>Winters</u>, 221 F.3d 1039, 1041 (8th Cir. 2000)); <u>Brown</u>, 2009 WL 2982934, at *12 n. 22 (declining to consider the merits of a search warrant to search the vehicle after concluding that the initial search, three days prior, was proper under the automobile exception); <u>United States v. Polar</u>, No. 4-cr-223 (JRT/RLE), 2004 WL 2980215, at *6 (D. Minn. Dec. 15, 2004); <u>see also</u>, <u>United States v. Johns</u>, 469 U.S. 478, 484 (1985) ("[a] vehicle in police custody may be searched on the basis of probable cause to believe that it contains contraband," and "[t]he justification to conduct such a warrantless search does not vanish once the car has been immobilized" or taken into police custody). Therefore, to the extent Defendant Kyle Clark's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing evidence discovered as a result of the execution of the November 7, 2019, Tribal Search Warrant, the undersigned recommends that Defendant's Motion to Suppress Searches and Seizures, [Docket No. 125], be **DENIED**.

[23] Defendant Kyle Clark also argues that the Search Warrants rely on "tainted evidence" because all the affidavits in support of these Search Warrant included a description of the evidence discovered during the November 2, 2019, roadside search; however, the Court has already determined that the November 2, 2019, roadside search of the GMC Yukon was constitutionally permissible. Thus, Defendant Kyle Clark's "tainted evidence" argument necessarily fails.

at 133–34. The Defendant bears the burden of proving a reasonable expectation of privacy in the area searched. Rakas, 439 U.S. at 130–31.

To establish a legitimate expectation of privacy, a defendant must show a subjective expectation of privacy and that his expectation of privacy is one that society is prepared to recognize as objectively reasonable. "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched, he has no standing to claim that they were searched or seized illegally." Barragan, 379 F.3d at 529–30 (citing United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994)). Ultimately, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Rakas, 439 U.S. at 134.

The Eighth Circuit has enumerated factors for Courts to consider in deciding whether a Defendant had an expectation of privacy triggering standing to challenge the constitutionality of a search including:

> [O]wnership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

Gomez, 16 F.3d at 256 (citing States v. Sanchez, 943 F.2d 110, 113 (1st Cir. 1991)).

The affidavit submitted in support of the July 24, 2020, Facebook Search Warrant lacks any indication that Defendant Kyle Clark has any privacy interest in any of the Facebook accounts subject to the July 24, 2020, Facebook Search Warrant. Further, and most important, Defendant Kyle Clark fails to make any attempt before this Court to establish that he has standing to challenge July 24, 2020, Facebook Search Warrant. Defendant Kyle Clark fails to offer any factual basis upon which the Court could reasonably conclude that he had a personal

privacy interest in any of the Facebook accounts subject to the July 24, 2020, Facebook Search Warrant.

On the record now before the Court each of the above delineated factors weighs in favor of finding that Defendant Kyle Clark lacks standing to assert any challenge to evidence flowing from the execution of the July 24, 2020, Facebook Search Warrant. Defendant Kyle Clark fails to even allege that he has an ownership interest or control over any of the Facebook accounts subject to the July 24, 2020, Facebook Search Warrant, and he fails to even allege that he had a subjective expectation of privacy in any of the Facebook accounts subject to the July 24, 2020, Facebook Search Warrant. Moreover, nothing on the record now before the Court supports finding that Defendant Kyle Clark had an objective expectation of privacy in said Facebook accounts at the time the July 24, 2020, Facebook Search Warrant was issued or executed.

It is Defendant Kyle Clark who bears the burden of proving a reasonable expectation of privacy in the area searched. Rakas, 439 U.S. at 130–31. Regarding the Facebook accounts subject to the July 24, 2020, Facebook Search Warrant, Defendant Kyle Clark has wholly failed to meet this burden.

On that basis, the Court concludes that Defendant Kyle Clark lacks standing to challenge the search of these Facebook accounts, and therefore, Defendant Kyle Clark lacks standing to seek the suppression of any evidence flowing from the execution of the July 24, 2020, Facebook Search Warrant.

Therefore, to the extent Defendant Kyle Clark's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing all evidence flowing from the execution of the July 24, 2020, Facebook Search Warrant, the undersigned recommends that Defendant Kyle Clark's Motion to Suppress Searches and Seizures, [Docket No. 125], be **DENIED**.

This leaves for this Court's consideration Defendant Kyle Clark's challenges to the February 28, 2020, Search Warrant; the April 2, 2020, iCloud Search Warrant; and the May 1, 2020, Facebook Search Warrant. Defendant Kyle Clark does not offer individual challenges to each of these Search Warrants; instead, he offers a "joined" challenge to the Search Warrants. (Def.'s Mem., [Docket No. 184], at 12). Defendant Kyle Clark asserts that each affidavit in support of these challenged Search Warrants lack probable cause, and he argues that each affidavit fails to establish a nexus between the place to be search and "a specific crime [he] is said to have committed . . . ." (Id. at 13).

As an initial matter, the Search Warrants are not constitutionally required to demonstrate a nexus between the place to be searched and a specific crime committed by Defendant Kyle Clark. Rather, an affidavit in support of a search warrant application is constitutionally required to demonstrate a nexus between the place to be searched and the contraband or evidence of a crime to be seized. See, United States v. Teelez, 217 F.3d 547, 550 (8th Cir. 2000).

"[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." Teelez, 217 F.3d at 550. However, it is well settled that a court issuing a search warrant may draw reasonable inferences from the totality of the circumstances in making its probable cause determination. See, e.g., Technical Ordnance, Inc. v. United States, 244 F.3d 641, 647 (8th Cir. 2001); Massachusetts v. Upton, 466 U.S. 727, 728 (1984). The Eighth Circuit has explicitly held that "[i]t is not necessary for an affidavit to include the name of the specific crime alleged. Rather, 'only a probability of criminal conduct need be shown.'" United States v. Summage, 481 F.3d 1075, 1078 (8th Cir. 2007) (internal citation omitted).

For the reasons discussed herein, each of the affidavits in support of the challenged search warrants is supported by probable cause and demonstrates a sufficient nexus between the place to be searched and the contraband or evidence of a crime to be seized. The Court discusses each of the challenged search warrants in turn.

### D. February 28, 2020, Search Warrant

Here again, the Court must first address the threshold issue of standing. Defendant Kyle Clark's Motion seeks to suppress all evidence flowing from the execution of the February 28, 2020, Search Warrant authorizing law enforcement to search the contents of two cellular telephones. Defendant Kyle Clark again fails to discuss whether or not he possesses standing to argue for the suppression of evidence flowing from the search of both cellular telephones, i.e. Device 1 and Device 2. In fact, PI Hoffman's affidavit in support of the February 28, 2020, Search Warrant indicates that one of the cellular phones belongs to Ms. White while the other phone belongs to Defendant Kyle Clark. (See, Gov't's Ex. 1 at 3). Further, PI Hoffman's subsequent affidavits specifically provide, and Defendant does not refute, that Device 1 was registered to Ms. White. (See, Gov't's Ex. 2 at 14).

On the record now before the Court, each of the previously outlined relevant factors, see gen., Gomez, 16 F.3d at 256, weighs in favor of finding that Defendant Kyle Clark lacks standing to assert any challenge to the evidence flowing from the search of Device 1 as a result of the execution of the February 28, 2020, Search Warrant. Defendant Kyle Clark fails to even allege that he has any ownership interest or control over Device 1; fails to even allege that he ever used or controlled Device 1; fails to allege that he had any ability to regulate access to the Device 1; and he fails to even allege that he had a subjective expectation of privacy in Device 1. Moreover, nothing on the record now before the Court supports finding that Defendant Kyle

Clark had an objective expectation of privacy in Device 1, and Defendant Kyle Clark has failed to demonstrate that the totality of the circumstances surrounding the execution of the February 28, 2020, Search Warrant merit finding that he had an expectation of privacy in Device 1. The Court concludes that Defendant Kyle Clark lacks standing to challenge the search of Device 1, and therefore, Defendant Kyle Clark lacks standing to seek the suppression of any evidence flowing from the search of Device 1.

Therefore, to the extent Defendant Kyle Clark's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing all evidence flowing from the execution of the February 28, 2020, Search Warrant as it relates to the search of Device 1, the undersigned recommends that Defendant Kyle Clark's Motion to Suppress Searches and Seizures, [Docket No. 125], be **DENIED**.

Accordingly, the Court's discussion hereafter of Defendant Kyle Clark's request to suppress evidence flowing from the execution of the February 28, 2020, Search Warrant is limited solely to evidence flowing from the search of his cellular telephone.

Defendant Kyle Clark argues that said evidence should be suppressed because the affidavit in support of the February 28, 2020, Search Warrant failed to demonstrate a nexus between the items to be searched for and cellular telephone and is unsupported by probable cause. Defendant Kyle Clark's argument ignores large portions of the affidavit submitted in support of the February 28, 2020, Search Warrant.

"[A] magistrate reviewing a warrant application is charged with the duty of determining whether a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Alexander, 574 F.3d 484, 489 (8th Cir. 2009) (quoting United States v. Hart, 544 F.3d 911, 914 (8th Cir. 2008)). "[T]here must be evidence of a nexus between the

contraband and the place to be searched before a warrant may properly issue[.]" United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000) (citing United States v. Koelling, 992 F.2d 817, 823 (8th Cir. 1993)).

Considering the affidavit submitted in support of the February 28, 2020, Search Warrant which authorized law enforcement to search Defendant Kyle Clark's cellular telephone, Magistrate Judge Wright could reasonably have concluded that there was a fair probability that evidence of a crime would be found on Defendant Kyle Clark's cellular telephone. The affidavit also established a nexus between the evidence to be searched for and said cellular telephone.

Specifically, the Court notes that, in his affidavit, PI Hoffman provided the details of the Redby Post Office robbery investigation, including the fact that Defendant Kyle Clark and two other individuals purchased a total of $6,000.00 money orders, on September 4, 2019, which Defendant Kyle Clark deposited into the bank account of Mr. Cruz, a Mexican citizen; that Defendant Kyle Clark continued to refer to his cellular telephone while making this deposit; that Defendant Kyle Clark's name was written in the "From" section of each of these money orders; and that United States Post Officer records revealed a correlated pattern of money orders being sent from Redby, Minnesota, in exchange for Priority Mail packages being sent from California to Redby or Red Lake, Minnesota. PI Hoffman attested that based on his training and experience individuals involved in the trafficking of narcotics use cellular telephones to coordinate activities in the furtherance of said narcotics trafficking; prefer the use of money order purchased by multiple individuals for purchasing narcotics to avoid detection and United States Department of Treasury reporting requirements; and use expedited service such as Priority Mail, such as was used in the present case, to limit the amount of time contraband remains in the delivery system. PI Hoffman also attested that individuals trafficking narcotics are often required to submit

payment in advance before the seller sends the narcotics, suggesting a pattern similar to the pattern of small Priority Mail mailings in exchange for the large packages mailed from California, a known source state for narcotics, including methamphetamine, demonstrated in the present case. PI Hoffman further attested that based on his training and experience he knew that information stored on cellular devices was stored for long periods of time, and it could be extracted through the use of forensic tools.

PI Hoffman's affidavit also contains details regarding the November 2, 2019, traffic stop, including Defendant Kyle Clark's flight from scene traffic stop; the roadside search of the GMC Yukon; and the November 7, 2019, second search of the GMC Yukon. Specifically, PI Hoffman attested that as a result of the search of the GMC Yukon driven by Defendant Kyle Clark law enforcement officers recovered various items of narcotics paraphernalia indicative of narcotics trafficking, including a scale, latex gloves, and a large number of baggies; a handgun with an extended magazine; $5,636.00 in cash; a substance which field tested as positive for methamphetamine concealed inside a candle; two cellular telephones; and receipts for five of the money orders purchased on September 4, 2019.

Upon review of PI Hoffman's affidavit, this Court finds that Magistrate Judge Wright had a sufficient basis upon which to believe that probable cause existed for the issuance of the February 28, 2020, Search Warrant, as it relates to Defendant Kyle Clark's cellular telephone. The affidavit contains information concerning Defendant Kyle Clark's alleged involvement in the procurement of money orders which were deposited or mailed to persons who reciprocated by mailing packages to the Redby, Minnesota and Red Lake, Minnesota area in a pattern indicative of narcotics trafficking; Defendant Kyle Clark's use of his cell phone while he was involved in this alleged conduct; and Defendant Kyle Clark flight from a traffic stop which

resulted in the discovery of narcotics and other contraband indicative of narcotics trafficking in the GMC Yukon he was driving. PI Hoffman also attested that—based on his training and experience—persons involved in the trafficking of narcotics use cellular telephones in a variety of ways, including communications, tracking, surveillance, and coordination of the purchase of narcotics, and he further attested that information contained on cellular phones could be used to determine the location of the phone's user during these various activities. This is the exact type of evidence which law enforcement sought to locate with the February 28, 2020, Search Warrant. Based on a totality of the circumstances, the affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime, as well as, a sufficient basis upon which to demonstrate a nexus between the items to be searched for and the cellular telephone to be searched; thus, there was probable cause for Magistrate Judge Wright to issue the warrant.

In addition, assuming solely for the sake of argument that the affidavit of PI Hoffman was not sufficient to establish probable cause or a nexus between the items to be searched for and the place to be searched, the Court concludes that officers relied in good faith on the probable cause determination by Magistrate Judge Wright when executing the February 28, 2020, Search Warrant.

Although evidence obtained as a result of the execution of a warrant unsupported by probable cause is generally inadmissible, Mapp v. Ohio, 367 U.S. 643 (1961), there is an exception "when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." Davis v. United States, 564 U.S. 229, 238-39 (2011) (quoting United States v. Leon, 468 U.S. 897, 922 (1984)). There are four circumstances in which the good-faith exception does not apply:

> (1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) "the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

United States v. Marion, 238 F.3d 965, 969 (2001). Here, Defendant Kyle Clark's only assertion related to this good faith exception is that the exception "ought not apply" because the Search Warrant included "tainted evidence." The Court has, however, already rejected this "tainted evidence" argument above.

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued authorizing the search of Defendant Kyle Clark's cellular telephone militates against suppressing the evidence possibly obtained during the execution of the February 28, 2020, Search Warrant. In his affidavit in support of his application for a search warrant, PI Hoffman presented sufficient facts indicating that Defendant Kyle Clark was involved in conduct indicative of narcotics trafficking, including Defendant Kyle Clark's use of his cellular phone during this alleged conduct. Pi Hoffman also present facts that Defendant Kyle Clark was arrested after fleeing the scene of a traffic stop which ultimately resulted in the discovery of narcotics and paraphernalia indicative of narcotics trafficking in the vehicle he was driving prior to his arrest. In his affidavit, PI Hoffman further attested that evidence of the alleged narcotics trafficking could be found on the cellular telephones of person involved in said narcotics trafficking, and he provided examples of said evidence. Accordingly, the affidavit in support of the February 28, 2020, Search Warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." In addition, it did not render the

warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

Thus, the Court concludes that the officers involved relied in good faith on the February 28, 2020, Search Warrant which had been issued by Magistrate Judge Wright.

Therefore, to the extent Defendant Kyle Clark's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing evidence flowing from the execution of the February 28, 2020, Search Warrant, the undersigned recommends that Defendant's Motion to Suppress Searches and Seizures, [Docket No. 125], be **DENIED**.

### E. April 2, 2020, iCloud Search Warrant

Here again, the Court must first address the threshold issue of standing. Defendant Kyle Clark's Motion seeks to suppress all evidence flowing from the execution of the April 2, 2020, iCloud Search Warrant authorizing law enforcement to search the contents of two iCloud accounts. Defendant Kyle Clark again fails to discuss whether or not he possesses standing to argue for the suppression of evidence flowing from the search of both iCloud accounts. In fact, PI Hoffman's affidavit in support of the April 2, 2020, iCloud Search Warrant specifically provides, and Defendant does not refute, that one of the iCloud accounts ("Subject Account 2") belongs to Ms. White. (See, Gov't Ex. 2 at 14).

On the record now before the Court and for the same reasons already discussed above, each of the previously outlined relevant factors, see gen., Gomez, 16 F.3d at 256, weighs in favor of finding that Defendant Kyle Clark lacks standing to assert any challenge to the evidence flowing from the search of Ms. White's iCloud account. As above, Defendant Kyle Clark fails to raise any argument in support of finding he has standing to challenge the search of Ms. White's iCloud account. Moreover, nothing on the record now before the Court supports finding that

Defendant Kyle Clark has standing to challenge the search of Ms. White's iCloud account. The Court concludes that Defendant Kyle Clark lacks standing to challenge the search of Ms. White's iCloud account, and therefore, Defendant Kyle Clark lacks standing to seek the suppression of any evidence flowing from the search of her account.

Therefore, to the extent Defendant Kyle Clark's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing all evidence flowing from the execution of the April 2, 2020, iCloud Search Warrant as it relates to the search of Ms. White's iCloud account, the undersigned recommends that Defendant Kyle Clark's Motion to Suppress Searches and Seizures, [Docket No. 125], be **DENIED**.

Accordingly, the Court's discussion hereafter of Defendant Kyle Clark's request to suppress evidence flowing from the execution of the April 2, 2020, iCloud Search Warrant is limited solely to evidence flowing from the search of his iCloud account.

As part of his collective challenge, Defendant Kyle Clark argues that said evidence should be suppressed because the affidavit in support of the April 2, 2020, iCloud Search Warrant failed to demonstrate a nexus between the items to be searched for and iCloud account, and the Search Warrant is unsupported by probable cause. Here again, Defendant Kyle Clark's argument ignores large portions of the affidavit submitted in support of the April 2, 2020, Search Warrant.

Considering the affidavit submitted in support of the April 2, 2020, Search Warrant which authorized law enforcement to search Defendant Kyle Clark's iCloud account, Magistrate Judge Wright could reasonably have concluded that there was a fair probability that evidence of a crime would be found on Defendant Kyle Clark's iCloud account. The affidavit also established a nexus between the evidence to be searched for and said cellular telephone.

Specifically, PI Hoffman's affidavit provided all of the information provided in his previous February 28, 2020, affidavit,[24] as well as, information regarding the attempted execution of the February 28, 2020, Search Warrant. PI Hoffman noted that when he powered on Defendant Kyle Clark's cellular telephone, he discovered that it was password protected. He further provided that he was able to learn that the email address used to register the device and its associated iCloud account was the iCloud account subject to the April 2, 2020, iCloud Search Warrant. PI Hoffman further attested that based on his training and experience the data associated with the subject accounts may help investigators determine the whereabouts of Defendant Kyle Clark and Kalyssa White on the date the Redby Post Office was robbed, as well as, the dates relevant to the packages shipped to and from California; may help law enforcement identify the source of the narcotics found in the GMC Yukon; may contain communications related to the alleged trafficking of narcotics and the September 4, 2019, robbery; and may reveal evidence related to Defendant Kyle Clark's and Ms. White's knowledge of the robbery, the contents of the relevant packages, and the efforts taken to alter their conspiratorially methods.

Upon review of PI Hoffman's affidavit, this Court finds that Magistrate Judge Wright had a sufficient basis upon which to believe that probable cause existed for the issuance of the April 2, 2020, Search Warrant, as it relates to Defendant Kyle Clark's iCloud account. The affidavit contains information concerning Defendant Kyle Clark's alleged involvement in the procurement of money orders which were deposited or mailed to person who reciprocated by mailing packages to the Redby, Minnesota and Red Lake, Minnesota area in a pattern indicative of

---

[24] Thus, for the reasons already discussed above, PI Hoffman's April 2, 2020, affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search of Defendant Kyle Clark's cellular telephone would uncover evidence of a crime. This determination weighs heavily in support of finding that probable cause supports the April 2, 2020, iCloud Search Warrant because PI Hoffman's affidavit provides a sufficient explanation of the connection between the cellular telephone and the associated iCloud account demonstrating that evidence which could be found on the cellular telephone, or could have once existed on said phone, could also be found on the iCloud account. See, United States v. Shipley, No. 16-cr-1061-TUCRMJR, 2017 WL 8897147, at *4 (D. Ariz. June 27, 2017), report and recommendation adopted, 2017 WL 3432371.

narcotics trafficking; Defendant Kyle Clark's use of his cell phone while he was involved in this alleged conduct; and Defendant Kyle Clark's flight from a traffic stop which resulted in the discovery of narcotics and other contraband indicative of narcotics trafficking in the GMC Yukon he was driving. PI Hoffman also attested that—based on his training and experience— persons involved in the trafficking of narcotics use cellular telephones in a variety of ways, including communications, tracking, surveillance, and coordination of the purchase of narcotics, and he further attested that such information may be stored on the subject iCloud account.

Based on a totality of the circumstances, the affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime, as well as, a sufficient basis upon which to demonstrate a nexus between the items to be searched for and iCloud account to be searched. Thus, there was probable cause for Magistrate Judge Wright to issue the warrant.

In addition, assuming solely for the sake of argument that the affidavit of PI Hoffman was not sufficient to establish probable cause or a nexus between the items to be searched for and the place to be searched, the Court concludes that officers relied in good faith on the probable cause determination by Magistrate Judge Wright when executing the April 2, 2020, Search Warrant.

Here again, Defendant Kyle Clark's only assertion related to the good faith exception is that the exception "ought not apply" because the Search Warrant included "tainted evidence." The Court has, however, already rejected this "tainted evidence" argument above.

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued authorizing the search of Defendant Kyle Clark's iCloud account militates against suppressing the evidence obtained during the execution of the April 2, 2020, iCloud

Search Warrant. For the reasons already discussed above, the affidavit in support of the April 2, 2020, Search Warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." In addition, it did not render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

Thus, the Court concludes that the officers involved relied in good faith on the April 2, 2020, iCloud Search Warrant which had been issued by Magistrate Judge Wright.

Therefore, to the extent Defendant Kyle Clark's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing evidence flowing from the execution of the April 2, 2020, iCloud Search Warrant, the undersigned recommends that Defendant Kyle Clark's Motion to Suppress Searches and Seizures, [Docket No. 125], be **DENIED**.

### F. May 1, 2020, Facebook Search Warrant

The Court must again first address the threshold issue of standing. Defendant Kyle Clark's Motion seeks to suppress all evidence flowing from the execution of the May 1, 2020, Facebook Search Warrant authorizing law enforcement to search the contents of two Facebook accounts. Defendant Kyle Clark again fails to discuss whether or not he possesses standing to argue for the suppression of evidence flowing from the search of both Facebook accounts. In fact, PI Hoffman's affidavit in support of the May 1, 2020, Facebook Search Warrant specifically provides, and Defendant Kyle Clark does not refute, that one of the Facebook accounts belongs to Ms. White. (See, Gov't's Ex. 3).

On the record now before the Court and for the same reasons already discussed above, each of the previously outlined relevant factors, see gen., Gomez, 16 F.3d at 256, weighs in favor of finding that Defendant Kyle Clark lacks standing to assert any challenge to the evidence flowing from the search of Ms. White's Facebook account. As above, Defendant Kyle Clark fails

to raise any argument in support of finding he has standing to challenge the search of Ms. White's Facebook account. Moreover, nothing on the record now before the Court supports finding that Defendant Kyle Clark has standing to challenge the search of Ms. White's Facebook account. The Court concludes that Defendant Kyle Clark lacks standing to challenge the search of Ms. White's Facebook account, and therefore, Defendant Kyle Clark lacks standing to seek the suppression of any evidence flowing from the search of her account.

Therefore, to the extent Defendant Kyle Clark's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing all evidence flowing from the execution of the May 1, 2020, Facebook Search Warrant as it relates to the search of Ms. White's Facebook account, the undersigned recommends that Defendant Kyle Clark's Motion to Suppress Searches and Seizures, [Docket No. 125], be **DENIED**.

Accordingly, the Court's discussion hereafter of Defendant Kyle Clark's request to suppress evidence flowing from the execution of the May 1, 2020, Facebook Search Warrant is limited solely to evidence flowing from the search of his Facebook account.

Considering the affidavit submitted in support of the May 1, 2020, Facebook Search Warrant which authorized law enforcement to search Defendant Kyle Clark's Facebook account, Magistrate Judge Leung could reasonably have concluded that there was a fair probability that evidence of a crime would be found on Defendant Kyle Clark's Facebook account. The affidavit also established a nexus between the evidence to be searched for and said Facebook account.

Specifically, PI Hoffman's affidavit provided all of the information provided in his previous affidavits,[25] as well as, information regarding the execution of the April 2, 2020, Search Warrant.

---

[25] Thus, for the reasons already discussed above, PI Hoffman's April 2, 2020, affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search of Defendant Kyle Clark's cellular

PI Hoffman attested that both of the iCloud accounts subject to the April 2, 2020, iCloud Search Warrant contained numerous pictures of Defendant Kyle Clark and Ms. White, including pictures depicting Defendant Kyle Clark and Ms. White "in the possession of firearms, large amounts of cash, and drug paraphernalia," and both accounts contained "notes" listing tracking numbers for United States Postal Service packages, including two of the packages discussed above which were mailed from California to an address in Red Lake, Minnesota. Defendant Kyle Clark's iCloud account also contained a screenshot of a Facebook Messenger conversation in which Defendant Kyle Clark is provided with a specific address for an apartment in Wilmington, California—the same address to which two Priority Mail Express packages believed to contain Postal Service money orders were mailed from Redby, Minnesota, and the message further provides that "this is the address for the 3400 please." PI Hoffman further provided that United States Postal Service busines records also indicate that two additional Priority Express packages were sent to this specific apartment on October 15, 2019, and October 21, 2019. Ms. White's iCloud account also contained a series of screenshots depicting other Facebook Messenger conversations with the Facebook user "Jos Ar," including a conversation in which "Jos Ar" writes "send me 8000 the rest I [sic] for him to help the lawyer." In his affidavit, PI Hoffman also provided information regarding the functionality of Facebook in regard to search warrants, including providing examples of the manner in which the information stored on the Facebook accounts could assist law enforcement in their investigation.

Upon review of PI Hoffman's affidavit, this Court finds that Magistrate Judge Leung had a sufficient basis upon which to believe that probable cause existed for the issuance of the May 1, 2020, Search Warrant, as it relates to Defendant Kyle Clark's Facebook account. The affidavit

---

telephone and iCloud account would uncover evidence of a crime. PI Hoffman's May 1, 2020, affidavit built upon this information.

contains information concerning Defendant Kyle Clark's alleged involvement in the procurement of money orders which were deposited or mailed to person who reciprocated by mailing packages to the Redby, Minnesota and Red Lake, Minnesota area in a pattern indicative of narcotics trafficking; Defendant Kyle Clark's flight from a traffic stop which resulted in the discovery of narcotics and other contraband indicative of narcotics trafficking in the GMC Yukon he was driving; and Defendant Kyle Clark's use of Facebook to conduct conversations indicative of the trafficking of narcotics.

Based on a totality of the circumstances, the affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime, as well as, a sufficient basis upon which to demonstrate a nexus between the items to be searched for and Facebook account to be searched. Thus, there was probable cause for Magistrate Judge Leung to issue the warrant.

In addition, assuming solely for the sake of argument that the affidavit of PI Hoffman was not sufficient to establish probable cause or a nexus between the items to be searched for and the place to be searched, the Court concludes that officers relied in good faith on the probable cause determination by Magistrate Judge Leung when executing the May 1, 2020, Search Warrant.

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued authorizing the search of Defendant Kyle Clark's Facebook account militates against suppressing the evidence obtained during the execution of the May 1, 2020, Facebook Search Warrant. For the reasons already discussed above, the affidavit in support of the May 1, 2020, Search Warrant was not "so lacking in indicia of probable cause as to render

official belief in its existence entirely unreasonable." Nor did it render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

Thus, the Court concludes that the officers involved relied in good faith on the May 1, 2020, Facebook Search Warrant which had been issued by Magistrate Judge Leung.

Therefore, to the extent Defendant Kyle Clark's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing evidence flowing from the execution of the May 1, 2020, Facebook Search Warrant, the undersigned recommends that Defendant Kyle Clark's Motion to Suppress Searches and Seizures, [Docket No. 125], be **DENIED**.

## IV.  Defendant Kyle Clark's Motion to Suppress Statements. [Docket No. 126].

As noted above, Defendant Kyle Clark initially filed a Motion to Suppress Statements. [Docket No. 126]. In his Motion, Defendant Kyle Clark generally asserts that he contests "Officer Bendel's continued inquiry, asking where [Defendant Kyle Clark] was heading" and the conversation that ensued thereafter. Defendant Kyle Clark generically asserts that he was "not free to leave" and was subject to interrogation.

At the Motion Hearing, Defendant Kyle Clark requested and was granted the opportunity to submit supplemental briefing on this Motion. However, Defendant Kyle Clark failed to submit any supplemental briefing or argument on his Motion to Suppress Statements.

"In a motion to suppress evidence, a moving party must specify the statement or evidence which is sought to be suppressed, and articulate with clarity the factual and legal basis upon which each is sought to be suppressed." United States v. Quiroz, 57 F. Supp. 2d 805, 822 (D. Minn. 1999), aff'd sub nom. United States v. Vasquez, 213 F.3d 425 (8th Cir. 2000). "If this is done, and no genuine factual issues are raised, the Court may resolve the motions based on the moving papers, with oral argument if desired." Id. at 822–23. If a motion to suppress, however,

fails to articulate the specific factual and legal grounds in support of the motion, the motion may be denied on the pleadings with the need for a hearing or oral argument. See, Quiroz, 57 F. Supp. at 823. "At the end of the day, as the moving party, at a minimum it is defendant's burden to come forth with some evidence and argument to support his position that evidence, statements or a witness identification should be suppressed." United States v. Edwards, 563 F. Supp. 2d 977, 994 (D. Minn. 2008) (citing United States v. Starks, 193 F.R.D. 624, 629 (D. Minn. 2000)), aff'd sub nom. United States v. Bowie, 618 F.3d 802 (8th Cir. 2010).

Defendant Kyle Clark's failure to provide any argument in support of his Motion to Suppress Statements and his failure to provide any supplement briefing on the Motion when he specifically requested and was granted leave to do so, falls well short of his burden here. This represents a sufficient, independent basis to deny his present Motion to Suppress Statements. See, e.g., United States v. Bellamy, No. 15-cr-165 (JRT/LIB) (8), 2015 WL 10382391, at *2 (D. Minn. Nov. 16, 2015), report and recommendation adopted, 2016 WL 829901 (D. Minn. Mar. 1, 2016); United States v. Jones, No. 9-cr-260(1) (DWF/RLE), 2009 WL 4723341, at *4 (D. Minn. Oct. 30, 2009); United States v. Mims, 812 F.2d 1068, 1074 (8th Cir. 1987); Quiroz, 57 F. Supp. 2d at 822–23 ("boilerplate motion" to suppress statements denied due to failure to satisfy specificity requirement); United States v. Adkins, No. 15-cr-5 (DWF), 2015 WL 3463377, at *4 (D. Minn. June 1, 2015).

Therefore, the undersigned recommends that Defendant Kyle Clark's Motion to Suppress Statements, [Docket No. 126], be **DENIED**.

## V. Defendant Graves's Motion to Suppress Evidence Obtained as a Result of Search and Seizure. [Docket No. 135].

Defendant Graves seeks an Order of this Court suppressing evidence obtained as a result of the execution of July 24, 2020, Facebook Search Warrant and the September 10, 2020,

Facebook Search Warrant. (Def.'s Mot. [Docket No. 135]). Defendant Graves seeks to suppress only that evidence flowing from the search of the Facebook accounts attributed to him. (Id.; Def.'s Mem., [Docket No. 185], at 2, 8). In support of this request, Defendant Graves argues that each Search Warrant is unsupported by probable cause as it relates to the Facebook accounts attributable to him. (See, Def.'s Mem. [Docket No. 185]).[26]

### A.  July 24, 2020, Facebook Search Warrant

Considering the affidavit submitted in support of the July 24, 2020, Facebook Search Warrant which authorized law enforcement to search Defendant Graves's '0018 Facebook account, Magistrate Judge Wright could reasonably have concluded that there was a fair probability that evidence of a crime would be found on Facebook account '0018. The affidavit also established a nexus between the evidence to be searched for and said Facebook account.

Specifically, PI Hoffman's affidavit provided all the details of the investigation up to July 24, 2020, including information related to Defendant Kyle Clark and Ms. White's alleged involvement in the procurement of money orders which were deposited or mailed to persons who reciprocated by mailing packages to the Redby, Minnesota and Red Lake, Minnesota area in a pattern indicative of narcotics trafficking; Defendant Kyle Clark's arrest and the discovery of

---

[26] Defendant Graves also makes an argument that the September 10, 2020, Facebook Search Warrant was unsupported by probable cause because Facebook account '6625—which was subject to the September 10, 2020, Facebook Search Warrant—was in the name "Dru Gra . . .," and PI Hoffman's affidavit failed to sufficiently establish that this was in fact Defendant Graves. For at least two reasons, Defendant Graves's argument here is unpersuasive. First, if Defendant Graves is not the person in control of Facebook account '6625, then Defendant Graves lacks standing to challenge the search of Facebook account '6625. See, e.g., Barragan, 379 F.3d at 529–30; Gomez, 16 F.3d at 256; Rakas, 439 U.S. at 134. Second, to the extent Defendant Graves argues the PI Hoffman's September 10, 2020, affidavit is required to demonstrate that Defendant Graves controls Facebook account '6625, the affidavit in support of the September 10, 2020, Search Warrant is not required to demonstrate that Facebook account '6625 belonged to Defendant Graves. Instead, an affidavit in support of a search warrant application is constitutionally required to demonstrate a nexus between the place to be searched and the contraband or evidence of a crime to be seized; the affidavit need not necessarily demonstrate that Defendant Graves controls the subject Facebook account. See, Teelez, 217 F.3d at 550; United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010). To the extent Defendant Graves argues that the evidence is insufficient to link him to Facebook account '6625 and therefore there is insufficient evidence to attribute to him the actions taken in that account, that argument is aimed at the merits of the charges against Defendant Graves; it is not material to the present probable cause inquiry.

narcotics in the GMC Yukon he was driving; Defendant Kyle Clark's Facebook conversations with Mr. Arcega-Vejar regarding the specific address where some of these suspected packages were mailed; and Ms. White's arrest following the search of a residence where law enforcement officer discovered a substantial amount of narcotics. PI Hoffman also provided records related to Defendant Kyle Clark's and Ms. White's Facebook accounts which demonstrate correspondence via Facebook Messenger with Facebook account '0018. In his affidavit, PI Hoffman characterized the conversations as "regarding the sale of narcotics," and he provided a transcript of these electronic conversations. These conversations include references to "jose arcega vejar," "loot," "baja california," and "mexico." PI Hoffman attested that based on his training and experience he believed that data contained in Facebook account '0018 may reveal further evidence of Defendant Graves's role in the alleged narcotics conspiracy.

Upon review of PI Hoffman's affidavit, this Court finds that Magistrate Judge Wright had a sufficient basis upon which to believe that probable cause existed for the issuance of the July 24, 2020, Facebook Search Warrant, as it relates to Facebook account '0018. The affidavit contains information concerning Defendant Kyle Clark and Ms. White's alleged involvement conduct indicative of narcotics trafficking; Defendant Graves's communication with Defendant Kyle Clark and Ms. White regarding the alleged conduct; and their use of Facebook in the furtherance of their alleged conduct.

Based on a totality of the circumstances, the affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime, as well as, a sufficient basis upon which to demonstrate a nexus between the items to be searched for and '0018 Facebook account to be searched. Thus, there was probable cause for Magistrate Judge Wright to issue the warrant.

In addition, assuming solely for the sake of argument that the affidavit of PI Hoffman was not sufficient to establish probable cause or a nexus between the items to be searched for and the place to be searched, the Court concludes that officers relied in good faith on the probable cause determination by Magistrate Judge Wright when executing the July 24, 2020, Search Warrant.

Although evidence obtained as a result of the execution of a warrant unsupported by probable cause is generally inadmissible, Mapp v. Ohio, 367 U.S. 643 (1961), there is an exception "when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." Davis v. United States, 564 U.S. 229, 238-39 (2011) (quoting United States v. Leon, 468 U.S. 897, 922 (1984)). There are four circumstances in which the good-faith exception does not apply:

> (1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) "the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

United States v. Marion, 238 F.3d 965, 969 (2001). Here, Defendant generically asserts that the July 24, 2020, Facebook Search Warrant falls within the third and fourth Leon exception. Defendant Graves, however, fails to offer any specific argument in support of that generic, conclusory assertion other than his overarching argument that the July 24, 2020, Facebook Search Warrant fails to establish probable cause.

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued authorizing the search of Facebook account '0018 militates against suppressing the evidence obtained during the execution of the July 24, 2020, Facebook Search

Warrant. For the reasons already discussed above, the affidavit in support of the July 24, 2020, Facebook Search Warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." In addition, it did not render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

Thus, the Court concludes that the officers involved relied in good faith on the July 24, 2020, Facebook Search Warrant which had been issued by Magistrate Judge Wright.

Therefore, to the extent Defendant Graves's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing evidence flowing from the execution of the July 24, 2020, Facebook Search Warrant, the undersigned recommends that Defendant Graves's Motion to Suppress Searches and Seizures, [Docket No. 135], be **DENIED**.

### B.  September 10, 2020, Facebook Search Warrant

Considering the affidavit submitted in support of the September 10, 2020, Facebook Search Warrant which authorized law enforcement to search Facebook account '6625, Magistrate Judge Wright could reasonably have concluded that there was a fair probability that evidence of a crime would be found in the search of Facebook account '6625. The affidavit also established a nexus between the evidence to be searched for and said Facebook account.

PI Hoffman's affidavit provided all of the information contained in his previous affidavits, as well as, information regarding the execution of the July 24, 2020, Facebook Search Warrant. PI Hoffman's affidavit also provided additional information regarding Mr. Arcega-Vejar and his involvement in the alleged narcotics trafficking, including Mr. Arcega-Vejar's previous conviction on federal narcotics charges involving twelve pounds of methamphetamine. PI Hoffman also provided additional excerpts from Facebook Messenger conversations between Mr. Arcega-Vejar and Defendant Kyle Clark, as well as, Facebook Messenger conversations

between Mr. Arcega-Vejar and Ms. White. These conversation excerpts reference the same topics as the previous Facebook Messenger conversations discussed above; the addresses to which various packages will be sent; the price of "a pill"; and the total price to be paid. PI Hoffman attested that based on his training and experiences the conversations constituted evidence that Mr. Arcega-Vejar was the source of narcotics in the presently alleged conspiracy.

These Facebook Messenger conversations involving Defendant Kyle Clark and Mr. Arcega-Vejar and Ms. White are relevant to Defendant Graves because they provide context for the Facebook Messenger conversations between Defendant Kyle Clark and Defendant Graves contained in PI Hoffman's September 10, 2020, affidavit. Specifically, PI Hoffman provided excerpts of Facebook Messenger conversations between Defendant Kyle Clark and Defendant Graves which PI Hoffman described as "regarding the purchase of narcotics" and in which Defendant Kyle Clark provided Defendant Graves with information Defendant Kyle Clark obtained from Mr. Arcega-Vejar. These conversations were recovered from Defendant Graves's '0018 Facebook account, which was one of the accounts discussed above in relation to the July 24, 2020, Facebook Search Warrant.

PI Hoffman attested that based on his training and experience the messages constitute evidence that Defendant Graves played a role in the alleged narcotics conspiracy, including sending funds to Mr. Arcega-Vejar for the purchase of narcotics. This is relevant to Facebook account '6625 because it provides context for Mr. Arcega-Vejar's conversation with said Facebook account in the name of "Dru Gra . . ." in which Mr. Arcega-Vejar tells "Dru Gra . . ." that "everything" is ready in California to send to "Dru Gra . . ." and he "won't need work . . . ."

PI Hoffman's affidavit also provided additional information regarding Ms. White. Specifically, the affidavit provided information related to her arrest after the April 23, 2020,

search of the residence in Red Lake, Minnesota which resulted in the discovery of a significant quantity of narcotics. The affidavit also included information from a named-cooperating defendant who said he and other individuals had been selling pills for Ms. White, and he further stated that he communicated with her via Facebook Messenger. PI Hoffman attested that the investigation following Ms. White's arrest had determined that Ms. White "received the pills though a package sent from California via USPS Priority Mail," and Ms. White's family members confirmed that Ms. White took possession of the parcel. PI Hoffman's affidavit also provides transcripts of conversations in which Ms. White relayed messages to various alleged co-conspirators regarding instructions on how to conceal funds during the mailing process, and PI Hoffman attested that other Facebook records show "extensive conversations" by Ms. White with an alleged co-conspirator regarding narcotics Mr. Arcega-Vejar had arranged to send Ms. White. This information regarding Ms. White is relevant to Defendant Graves and Facebook account '6625 here because it provides context for Ms. White's later statement regarding "Drew." Specifically, in one conversation between Ms. White and J.R., an alleged co-conspirator, regarding "a thousand pills," Ms. White tells J.R. that the supplier is only sending them the pills "to get his money back from what [K]yle. Drew, and [C]orey fucked up."

Upon review of PI Hoffman's affidavit, this Court finds that Magistrate Judge Wright had a sufficient basis upon which to believe that probable cause existed for the issuance of the September 10, 2020, Facebook Search Warrant, as it relates to Facebook account '6625.[27] The affidavit contains information concerning Defendant Graves's alleged involvement in conduct indicative of the trafficking of narcotics, as well as, Defendant Graves's use of Facebook in the

---

[27] Again, this assumes solely for the sake of the present analysis that Defendant Graves maintains control or a privacy interest in Facebook account '6625. This analysis may be altered if Defendant Graves did not maintain any privacy interest in or control over Facebook account '6625; however, if Defendant Graves did not maintain any privacy interest in or control over Facebook account '6625, then Defendant Graves would lack standing to challenge the search of Facebook account '6625. See, n. 26 supra.

furtherance of said alleged conduct. Moreover, in making the initial probable cause determination, Magistrate Judge Wright was permitted to make all reasonable inferences, Technical Ordnance, Inc. v. United States, 244 F.3d 641, 647 (8th Cir. 2001), and given the totality of the circumstances in the present case, the connection of "Dru Gra . . ." to Defendant Drew Graves is a reasonable inference. PI Hoffman's affidavit also provides specific information demonstrating that Mr. Arcega-Vejar communicated with "Dru Gra . . ." directly.

Based on a totality of the circumstances, the affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime, as well as, a sufficient basis upon which to demonstrate a nexus between the items to be searched for and Facebook account '6625. Thus, there was probable cause for Magistrate Judge Wright to issue the September 10, 2020, Facebook Search Warrant.

In addition, assuming solely for the sake of argument that the affidavit of PI Hoffman was not sufficient to establish probable cause or a nexus between the items to be searched for and the place to be searched, the Court concludes that officers relied in good faith on the probable cause determination by Magistrate Judge Wright when executing the September 10, 2020, Facebook Search Warrant.

Defendant Graves generically asserts that the September 10, 2020, Facebook Search Warrant falls within the third and fourth Leon exception. Defendant Graves, however, fails to offer any specific argument in support of his conclusory assertion other than his overarching argument that the September 10, 2020, Facebook Search Warrant fails to establish probable cause.

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued authorizing the search of Facebook account '6625 militates against

suppressing the evidence obtained during the execution of the September 10, 2020, Facebook Search Warrant. For the reasons already discussed above, the affidavit in support of the September 10, 2020, Facebook Search Warrant, relative to Facebook account '6625, was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" nor "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

Thus, as it applies to Facebook account '6625, the Court concludes that the officers involved relied in good faith on the September 10, 2020, Facebook Search Warrant which had been issued by Magistrate Judge Wright.

Therefore, to the extent Defendant Graves's Motion to Suppress Evidence Obtained as a Result of Search and Seizure seeks an Order of this Court suppressing evidence flowing from the execution of the September 10, 2020, Facebook Search Warrant, the undersigned recommends that Defendant Graves's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 135], be **DENIED**.

## VI. Defendant Valerie Clark's Motion to Suppress Evidence Obtained as a Result of Search and Seizure. [Docket No. 145].

Defendant Valerie Clark seeks an Order of this Court suppressing evidence obtained as a result of the execution of July 24, 2020, Facebook Search Warrant. (Def.'s Mot. [Docket No. 145]). Defendant Valerie Clark seeks to suppress only that evidence flowing from the search of the Facebook account in her name. (Def.'s Mem., [Docket No. 186], at 1). In support of this request, Defendant Valerie Clark argues that the July 24, 2020, Facebook Search Warrant is unsupported by probable cause, fails to provide any evidence that she had knowledge of any "drug conspiracy whatsoever," and fails to sufficiently provide a nexus between her, her Facebook account, and the alleged criminal conspiracy. (Id. at 1, 5, 6).

Considering the affidavit submitted in support of the July 24, 2020, Facebook Search Warrant which authorized law enforcement to search Facebook account '4263, Magistrate Judge Wright could reasonably have concluded that there was a fair probability that evidence of a crime would be found in the search of Facebook account '4263. The affidavit also established a nexus between the evidence to be searched for and said Facebook account.

The affidavit in support of the July 24, 2020, Facebook Search Warrant provided that Defendant Valerie Clark was the female individual predominately depicted in the publicly viewable photographs on Facebook account '4263. PI Hoffman's affidavit also provided all the details of the investigation up to July 24, 2020, including information related to Defendant Kyle Clark and Ms. White's alleged involvement in the procurement of money orders which were deposited or mailed to persons who reciprocated by mailing packages to the Redby, Minnesota and Red Lake, Minnesota area in a pattern indicative of narcotics trafficking; Defendant Kyle Clark's arrest and the discovery of narcotics in the GMC Yukon he was driving; Defendant Kyle Clark's Facebook conversations with Mr. Arcega-Vejar regarding the specific address where some of these suspected packages were mailed; and Ms. White's arrest following the search of a residence where law enforcement officer discovered a substantial quantity of narcotics. Other Facebook Messenger conversations related to Defendant Kyle Clark's and Ms. White's Facebook accounts "regarding the sale of narcotics" included references to "jose arcega vejar," "loot," "baja california," and "mexico." PI Hoffman's affidavit also provided Facebook Messenger conversations between Ms. White and Mr. Arcega-Vejar in which the two discuss the delivery of "pills" to Ms. White, tracking numbers, the price per pill, and the confirmation of delivery of a package to Ms. White. This information puts into context the Facebook Messenger

conversation between Ms. White and Facebook account '4263—Defendant Valerie Clark's Facebook account.

Specifically, in his affidavit, PI Hoffman provided an excerpt of a conversation between Ms. White and Facebook account '4263 in which the user of Facebook account '4263 informs Ms. White that she "got them numbers" for "[t]hat $$." Based on his training and experience, PI Hoffman attested that he believed this reference may refer to transaction reference numbers corresponding to transferring money, and he further attested that individuals involved in sending money orders or money transfers in furtherance of criminal activity often have to provide transaction reference numbers or other proof of payment being sent. Notably, PI Hoffman's affidavit further provided that on the day before this conversation regarding the possible transaction reference numbers, Defendant Valerie Clark in fact made two $1,000.00 MoneyGram money transfers to two individuals in Baja California, Mexico—the suspected source of the alleged narcotics.

Further, PI Hoffman attested that at least three of the suspected narcotics packages mailed to Redby and Red Lake, Minnesota were tracked by an IP address registered to Defendant Valerie Clark.[28] Each of these tracked packages is among the packages which was exchanged for money orders in a manner indicative of narcotics trafficking.

---

[28] Defendant Valerie Clark takes issue with the "lack of verification" by PI Hoffman regarding whether or not it was in fact Defendant Valerie Clark who was tracking these packages because other persons, including alleged co-conspirators, may have had access to the use of her IP address. (See, Def.'s Mem., [Docket No. 185], at 4). Her argument here is akin to other "open WiFi" arguments which have been rejected by the Courts in making probable cause determinations. See, United States v. Dakoski, No. 1:16-cr-114 (MR/DLH), 2017 WL 9515320, at *5 (W.D.N.C. Jan. 2017);  United States v. Mixon, No. 17-cr-797, 2019 WL 2085190, at *4 (N.D. Ill. May 13, 2019); see also, United States v. Freeman, No. 10-cr-68 (JRT/RLE), 2010 WL 4386897, at *11 (D. Minn. May 13, 2010), report and recommendation adopted, 2010 WL 4386874 (D. Minn. Oct. 28, 2010); United States v. Stults, 575 F.3d 834, 844 (8th Cir. 2009); United States v. Wylie, No. 16-cr-144 (RHK/LIB), 2016 WL 4473469, at * 14–15 (D. Minn. July 18, 2016), report and recommendation adopted, 2016 WL 4445241 (D. Minn. Aug. 23, 2016); United States v. Gray, No. 13-cr-256 (DSD/SER), 2014 WL 1415080, at *2 n.1 (D. Minn. Apr. 10, 2014).

Upon review of PI Hoffman's affidavit, this Court finds that Magistrate Judge Wright had a sufficient basis upon which to believe that probable cause existed for the issuance of the July 24, 2020, Facebook Search Warrant, as it relates to Facebook account '4263. The affidavit contains information concerning Defendant Kyle Clark and Ms. White's alleged involvement in conduct indicative of narcotics trafficking; Defendant Valerie Clark's involvement in that alleged conduct through the electronic tracking of suspected narcotics packages; Defendant Valerie Clark's control of Facebook account '4263; communications between Ms. White and Facebook account '4263 regarding matters upon which a reasonable inference of narcotics trafficking could be made; Defendant Valerie Clark's making of two money transfers in furtherance of the alleged narcotics trafficking; and Defendant Valerie Clark's use of Facebook in the furtherance of the alleged criminal conduct.

Based on a totality of the circumstances, the affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime, as well as, a sufficient basis upon which to demonstrate a nexus between the items to be searched for and Facebook account '4263. Thus, there was probable cause for Magistrate Judge Wright to issue the warrant.

In addition, assuming solely for the sake of argument that the affidavit of PI Hoffman was not sufficient to establish probable cause or a nexus between the items to be searched for and the place to be searched, the Court here again concludes that officers relied in good faith on the probable cause determination by Magistrate Judge Wright when executing the July 24, 2020, Search Warrant relative to Defendant Valerie Clark.

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued authorizing the search of Facebook account '4263 militates against

suppressing the evidence obtained during the execution of the July 24, 2020, Facebook Search Warrant. For the reasons already discussed above, the affidavit in support of the July 24, 2020, Facebook Search Warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" nor "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

Thus, as it relates to Facebook account '4263, the Court concludes that the officers involved relied in good faith on the July 24, 2020, Facebook Search Warrant which had been issued by Magistrate Judge Wright.

Therefore, to the extent Defendant Valerie Clark's Motion to Suppress Evidence Obtained as a Result of Search and Seizure seeks an Order of this Court suppressing evidence flowing from the execution of the July 24, 2020, Facebook Search Warrant, the undersigned recommends that Defendant Valerie Clark's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 145], be **DENIED**.

VII.    **Conclusion**

Therefore, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT** Defendant Kyle Clark's Motion for Disclosure of Confidential Informants, [Docket No. 122], is **DENIED**.

Furthermore, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.   Defendant Kyle Clark's Motion to Suppress Searches and Seizures, [Docket No. 125], be **DENIED**;

2.   Defendant Kyle Clark's Motion to Suppress Statements, [Docket No. 126], be **DENIED**;

3.  Defendant Graves's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 135], be **DENIED**; and

4.  Defendant Valerie Clark's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 145], be **DENIED**

Dated: September 15, 2021                        s/Leo I. Brisbois
                                                 Hon. Leo I. Brisbois
                                                 U.S. MAGISTRATE JUDGE

## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.