## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America, | Case No. 20-cr-0223 (WMW/LIB) |
| Plaintiff, | |
| | **ORDER** |
| v. | |
| Kyle Dale Clark (1), Valerie Ann Clark (3),<br>and Drew William Graves (7), | |
| Defendants. | |

---

This matter is before the Court on the September 15, 2021 Report and Recommendation (R&R) of United States Magistrate Judge Leo I. Brisbois.  (Dkt. 204.)  The R&R recommends denying the motions to suppress evidence filed by Defendants Kyle Dale Clark, Valerie Ann Clark, and Drew William Graves.  In a September 15, 2021 Order, the magistrate judge also denied Kyle Clark's motion to disclose the identity of a confidential informant.  (Dkt. 203.)  Both Kyle Clark and Graves object to the R&R.  Kyle Clark also appeals the denial of his motion to disclose the identity of the confidential informant.  For the reasons addressed below, the September 15, 2021 Order is affirmed, the objections to the R&R are overruled, and the R&R is adopted.

### BACKGROUND[1]

In an October 7, 2020 indictment, a federal grand jury charged Defendants Kyle Dale Clark, Jose Arcega-Vejar, Valerie Ann Clark, Vanessa Louise Cobenais, Kathi Lyn

---

[1]     Because the R&R includes a detailed description of the factual and procedural background of this case, the Court only briefly summarizes the factual and procedural background for the purpose of this Order.

Dudley, Drew William Graves, and Kalyssa Kailani Deanah White with conspiracy to distribute methamphetamine from August 2019 through December 2019. Kyle Clark also is charged with being a felon in possession of a firearm.[2] The record establishes the following facts about the investigation from which these charges arise.

In September 2019, an unknown individual robbed the Redby Post Office in Redby, Minnesota. While investigating this robbery, postal inspectors learned that three individuals, including Kyle Clark, obtained thousands of dollars in money orders on September 4, 2019. Later that day, Kyle Clark deposited seven $1,000 money orders into the bank account of a resident of Mexico. The robbery investigation revealed "a pattern of money order purchases, Priority Mail Express envelopes mailed from Redby to locations in California, and Priority Mail packages of seven pounds or more mailed from California to Redby or Red Lake, Minnesota."

Shortly after 11:00 p.m. on November 2, 2019, Red Lake Police Officer Pat Bendel observed a maroon GMC Yukon departing from a known drug house on the Red Lake Indian Reservation. Earlier that week, Officer Bendel had received an alert from a colleague instructing officers to be on the lookout for a maroon GMC Yukon dropping off drugs in the area. Officer Bendel followed the vehicle and observed it park at another residence that law enforcement suspected to be involved with drug-trafficking activity. A short time later the vehicle departed this residence, and Officer Bendel observed the

---

[2]     The indictment also charges Corey Lee Donnell with selling or transferring a firearm to a prohibited person. This charge is not relevant to the pending R&R.

vehicle accelerate to a speed of approximately 40 to 45 miles per hour in a 25-mile-per-hour zone.  Officer Bendel initiated a traffic stop.

During the traffic stop, the driver identified himself as Kyle Clark.  Officer Bendel later identified the woman in the front passenger seat as White.  After running identification checks on both individuals, Officer Bendel asked Kyle Clark where he was going.  Kyle Clark became "extremely nervous," stuttering and becoming "shaky."  Kyle Clark told Officer Bendel that he was going to his home in Redby.  When Officer Bendel asked why Kyle Clark was driving toward a dead-end road in the opposite direction of Redby, Kyle Clark was unable to provide a reason for doing so.  Officer Bendel instructed Kyle Clark to exit the vehicle and asked him again where he was going.  Kyle Clark responded that he was "just driving around."

Shortly thereafter, Officer Bendel approached the passenger side of the vehicle and shined his flashlight into the back seat, where he observed "burned tinfoil."  Officer Bendel recognized burned tin foil as evidence of narcotics use and began retrieving gloves to wear during a search of the vehicle.  Before Officer Bendel could begin a search, Kyle Clark began running from the scene and into the woods, where he tripped and was apprehended by another officer.  Police arrested Kyle Clark and White and conducted a roadside search of the vehicle, from which the officers recovered a cell phone, a large quantity of methamphetamine, a firearm and loaded magazines, and approximately $5,600 in cash.

Law enforcement officers subsequently obtained several search warrants in connection with their investigation of the alleged drug-trafficking conspiracy.  On

November 7, 2019, law enforcement officers sought and obtained a warrant to search Kyle Clark's vehicle. Pursuant to this warrant, law enforcement officers recovered a second cell phone, money-order receipts, and drug paraphernalia. On February 28, 2020, law enforcement officers sought and obtained a warrant to search the contents of the two phones recovered from Kyle Clark's vehicle, which allegedly belonged to Kyle Clark and White. On April 2, 2020, law enforcement officers sought and obtained a warrant to search iCloud accounts allegedly associated with Kyle Clark and White. On May 1, 2020, law enforcement officers sought and obtained a warrant to search Facebook accounts allegedly associated with Kyle Clark and White. And on July 24, 2020, and September 10, 2020, law enforcement officers sought and obtained warrants to search Facebook accounts allegedly associated with Graves and several other alleged co-conspirators.

Kyle Clark moved for an order disclosing the identity of the confidential informant who told law enforcement officers to be on the lookout for a maroon GMC Yukon dropping off drugs in the Red Lake area. The magistrate judge denied that motion in a September 15, 2021 Order, concluding that Kyle Clark had not demonstrated that the informant's identity and testimony are material to Kyle Clark's defense. Kyle Clark now appeals that order.

In addition, Kyle Clark, Valerie Clark and Graves each move to suppress evidence obtained during the foregoing investigation. In a September 15, 2021 R&R, the magistrate judge recommends denying the motions to suppress. In particular, the R&R concludes that the November 2, 2019 traffic stop and roadside search of Kyle Clark's

vehicle were not unlawful and the subsequently obtained search warrants are supported by probable cause.  Kyle Clark and Graves object to several aspects of the R&R.

## ANALYSIS

### I.      Kyle Clark's Appeal of the Magistrate Judge's Order

Kyle Clark appeals the magistrate judge's September 15, 2021 Order denying Kyle Clark's motion to disclose the identity of a confidential informant.  In particular, Kyle Clark seeks the identity of the informant who told law enforcement officers in or about November 2019 that a maroon GMC Yukon would be dropping off drugs at locations in the Red Lake area.

A district court's review of a magistrate judge's order on a nondispositive matter is "extremely deferential."  *Scott v. United States*, 552 F. Supp. 2d 917, 919 (D. Minn. 2008).  Reversal is warranted only if the ruling is clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Crim. P. 59(a); LR 72.2(a).  A magistrate judge's ruling is clearly erroneous when, although there is evidence to support the ruling, the reviewing court, after examining the entire record, "is left with the definite and firm conviction that a mistake has been committed."  *Wells Fargo & Co. v. United States*, 750 F. Supp. 2d 1049, 1050 (D. Minn. 2010) (internal quotation marks omitted).  A magistrate judge's ruling is contrary to law when it either fails to apply or misapplies pertinent statutes, case law or rules of procedure.  *Edeh v. Midland Credit Mgmt., Inc.*, 748 F. Supp. 2d 1030, 1043 (D. Minn. 2010).

Generally, the government may withhold the identity of a confidential informant. *Roviaro v. United States*, 353 U.S. 53, 59 (1957).   There is no "fixed rule" for

determining whether disclosure is required.  *Id.* at 62.  Instead, courts must balance "the public interest in protecting the flow of information against the individual's right to prepare [a] defense."  *Id.*  Relevant factors include "the crime charged, the possible defenses, [and] the possible significance of the informer's testimony."  *Id.*  When determining whether disclosure is required, "the threshold issue is whether the informant is a material witness" because disclosure is not required "unless it is vital to a fair trial." *Carpenter v. Lock*, 257 F.3d 775, 779 (8th Cir. 2001) (internal quotation marks omitted). If the informant was an active participant in or witness of the charged offense, "disclosure will almost always be material to the accused's defense."  *Id.* (internal quotation marks omitted).  But disclosure is not required "if the informant acts as a mere tipster, i.e., a person who merely conveys information but does not witness or participate in the offense."  *Id.* (internal quotation marks omitted).  "The defendant has the burden of showing materiality, which requires more than speculation that the evidence an informant may provide will be material to overcome the government's privilege to withhold the identity of the informant."  *Id.* (internal quotation marks omitted).

Kyle Clark seeks the identity of the informant who told law enforcement officers that a maroon GMC Yukon would be dropping off drugs at locations in the area. According to Kyle Clark, the identity of this informant "is important to establish Mr. Clark's available defenses, namely that he was not a narcotic's [sic] dealer, was not present during certain drop offs, and most certainly was not the leader in an overarching conspiracy."  But as the magistrate judge correctly observed, nothing in the record suggests that this informant actively participated in or witnessed the charged offense.

Nor does the record suggest that this informant has any knowledge about Kyle Clark, let alone information that could be material to Kyle Clark's defense. Rather, the record demonstrates that this informant merely provided law enforcement with the description of a vehicle that the informant believed to be involved in drug trafficking. The magistrate judge's determination that the informant was a mere tipster is not clearly erroneous. And as a mere tipster, this informant's identity may remain confidential. *See Carpenter*, 257 F.3d at 779.

Kyle Clark contends that he "can't prove" that the informant's identity and testimony are material to his defense "given the Government's secretive posture." But it is the *defendant's* burden to demonstrate that the identity of an informant is material to his or her defense. *Carpenter*, 257 F.3d at 779. Kyle Clark argues that the magistrate judge should have conducted an *in camera* review to determine whether the informant's identity and testimony are material to Kyle Clark's defense. But "mere speculation that undisclosed information is material is not enough to compel . . . *in camera* review" of evidence pertaining to a confidential informant. *United States v. Oliver*, 950 F.3d 556, 563 (8th Cir. 2020) (affirming district court's denial of defendant's motion to disclose the identity of an informant); *accord United States v. Van Brocklin*, 115 F.3d 587, 594 (8th Cir. 1997) (observing that "speculation" about the contents of material in the prosecutor's possession "does not compel the district court to review" the material *in camera*). Here, Kyle Clark speculates that the informant's identity and testimony will be material to his defense. But he identifies no evidence to support this vague assumption. As such, *in*

*camera* review is unnecessary, and the record supports the magistrate judge's denial of Kyle Clark's motion to disclose the informant's identity.

Because the magistrate judge's September 15, 2021 Order is neither clearly erroneous nor contrary to law, the September 15, 2021 Order is affirmed.

## II.    Objections to the R&R

Kyle Clark and Graves object to the R&R's recommendation to deny their respective motions to suppress evidence.  This Court reviews *de novo* those aspects of an R&R to which a defendant objects.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3); LR 72.2(b)(3); *accord Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (per curiam). The Court addresses each objection in turn.

### A.    Kyle Clark's Objections

Kyle Clark objects to two aspects of the R&R.  First, he objects to the R&R's determination that law enforcement officers lawfully prolonged the November 2, 2019 traffic stop and lawfully searched Kyle Clark's vehicle.  Second, Kyle Clark objects to the R&R's probable-cause assessment of the affidavits submitted in support of the four search warrants that officers obtained to search Kyle Clark's vehicle, cell phone, iCloud account and Facebook account.

### 1.    November 2, 2019 Traffic Stop and Vehicle Search

The Fourth Amendment to the United States Constitution guarantees the right to be free from unreasonable searches and seizures.  U.S. Const. amend. IV.  "A traffic stop constitutes a seizure and must be supported by probable cause or reasonable suspicion."

*United States v. Marin*, 988 F.3d 1034, 1040 (8th Cir. 2021) (internal quotation marks omitted).

It is undisputed that the November 2, 2019 traffic stop was lawful at its inception because Officer Bendel observed Kyle Clark's vehicle exceeding the speed limit. Kyle Clark argues, however, that law enforcement officers unlawfully prolonged the traffic stop and unlawfully conducted a warrantless roadside search of his vehicle.

"Under the Fourth Amendment, an officer may not extend a traffic stop longer than the time needed to handle the matter for which the stop was made unless [the officer] has reasonable suspicion of criminal activity." *United States v. Pacheco*, 996 F.3d 508, 511 (8th Cir. 2021) (internal quotation marks omitted). Reasonable suspicion requires an officer to have a particularized and objective basis for suspecting criminal activity based on the officer's experience and specialized training. *Id.* "Although a mere hunch is insufficient to establish reasonable suspicion, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 511–12 (internal quotation marks omitted). When determining whether an officer had reasonable suspicion of criminal activity, courts consider the totality of the circumstances. *Id.* at 512. Conduct that is innocent in isolation can give rise to reasonable suspicion of criminal activity when considered under the totality of the circumstances. *United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998).

Kyle Clark first objects to the magistrate judge's determination that Officer Bendel lawfully prolonged the traffic stop beyond the length of time necessary to issue a

citation for speeding. But the totality of the circumstances establishes that Officer Bendel had reasonable suspicion of criminal activity to justify extending the duration of the traffic stop. Several facts support this conclusion.

First, Kyle Clark's vehicle matched the description of a vehicle suspected to be involved in drug trafficking in the area. Although Officer Bendel did not have personal knowledge as to the source of the information underlying this suspicion, an investigatory stop "may be based on the collective knowledge of all law enforcement officers involved in the investigation and need not be based solely upon information within knowledge of the officer(s) on the scene if there is some degree of communication." *United States v. Rowe*, 878 F.3d 623, 628 (8th Cir. 2017). Officer Bendel testified that, several days before he encountered Kyle Clark's maroon GMC Yukon, he had received a text message from a colleague on the drug task force advising him to be on the lookout for a maroon GMC Yukon dropping off drugs at houses in the area.[3] Consistent with this information, before initiating the traffic stop, Officer Bendel observed the maroon GMC Yukon briefly stop at two houses in the area, including one house known to have been involved

---

[3]      Kyle Clark contends that this information originated from an informant whose reliability has not been established. Assuming that the informant at issue here was unknown to police and had no proven track record of reliability, police in such circumstances "may deem an informant credible and make a finding of probable cause when an informant's information is at least partly corroborated." *United States v. Corrales-Portillo*, 779 F.3d 823, 830 (8th Cir. 2015) (internal quotation marks omitted). Moreover, "a lesser showing of the reliability of an informant is required to support the reasonable suspicion which is a prerequisite for an investigatory stop than is needed to support probable cause for a search." *United States v. Childress*, 721 F.2d 1148, 1150 (8th Cir. 1982). For the reasons addressed in the R&R and in this Order, Officer Bendel sufficiently corroborated the informant's information before prolonging the challenged traffic stop. Therefore, the informant's information is properly considered.

in drug trafficking activity in the past and another house suspected to be involved in drug trafficking activity. These facts contributed to Officer Bendel's suspicion of criminal activity.

Second, after stopping the vehicle for speeding, Officer Bendel asked Kyle Clark where he was going. An officer may briefly detain the occupants of a vehicle during a traffic stop while the officer completes routine tasks, including "asking the occupants about their destination, route, and purpose." *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017) (internal quotation marks omitted); *accord Pacheco*, 996 F.3d at 512; *Marin*, 988 F.3d at 1041. And an officer's reasonable suspicion to prolong the duration of a traffic stop may be based on vague, confusing, implausible or inconsistent answers to such routine questions. *Pacheco*, 996 F.3d at 512; *Marin*, 988 F.3d at 1041; *Murillo-Salgado*, 854 F.3d at 416. Here, in response to Officer Bendel's routine questions, Kyle Clark first explained that he was "heading home" to Redby. When Officer Bendel then asked Kyle Clark why he was driving toward a dead-end road in the opposite direction of Redby, Kyle Clark "couldn't answer the question." A short time later, Kyle Clark told Officer Bendel that he was "just driving around." These vague, confusing, implausible and inconsistent answers to Officer Bendel's routine questions contributed to Officer Bendel's suspicion of criminal activity.

Third, Officer Bendel testified that Kyle Clark became "extremely nervous" when asked where he was going. An officer's reasonable suspicion to prolong the duration of a traffic stop may be based on "unusual nervousness" exhibited by the vehicle's occupant. *Pacheco*, 996 F.3d at 512 (internal quotation marks omitted); *accord Marin*, 988 F.3d at

1041–42.  Here, Officer Bendel testified that Kyle Clark began stuttering and "seemed like he was shaky" in response to routine questions.  Kyle Clark correctly asserts that it is not unusual for a person to be nervous when stopped or arrested by a police officer.  But Kyle Clark was not under arrest when he exhibited nervousness, and Officer Bendel specifically testified that Kyle Clark was *not* nervous initially and only *became* "extremely nervous" when asked a relatively benign question about where he was going.  Thus, the unusual nature of Kyle Clark's nervous behavior contributed to Officer Bendel's suspicion of criminal activity.

Fourth, shortly after asking Kyle Clark the routine questions about his destination, Officer Bendel illuminated the interior of the vehicle with his flashlight and observed burned tin foil on the back seat.  Although Kyle Clark contends that it was impermissible for Officer Bendel to shine his flashlight into the vehicle, it is not unlawful for an officer to use a flashlight to illuminate interior spaces of a vehicle that are visible from the outside.  *See United States v. Sanchez*, 955 F.3d 669, 677 (8th Cir. 2020).  Kyle Clark also argues that the incriminating nature of the burned tin foil was not immediately apparent.  But courts repeatedly have recognized that burned tin foil is indicative of illicit drug use.  *See, e.g.*, *United States v. Spotted Elk*, 548 F.3d 641, 648 (8th Cir. 2008) (observing that "burned aluminum foil" is "commonly used to smoke or process cocaine"); *United States v. Pinnow*, 469 F.3d 1153, 1157 (8th Cir. 2006) (observing that "the presence of burnt aluminum foil," among other things, "was strong evidence of recent manufacture" of methamphetamine); *United States v. Bailey*, 422 F.3d 670, 672 (8th Cir. 2005) (observing that "tin foil with burn marks [is] consistent with use of

methamphetamine").   Officer Bendel testified that he recognized burned tin foil as indicative of narcotics use because drug users "will put the drugs on the tin foil, burn underneath it, and then inhale the smoke."   For these reasons, Officer Bendel's observation of burned tin foil in the backseat of the vehicle contributed to Officer Bendel's suspicion of criminal activity.

Fifth, shortly after Officer Bendel observed the burned tin foil and began preparing to search the vehicle, Kyle Clark began running into the woods.  Nervous or evasive behavior is relevant to determining whether reasonable suspicion exists, and "[h]eadlong flight—wherever it occurs—is the consummate act of evasion" and "is certainly suggestive of" wrongdoing.  *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).  As such, Kyle Clark's sudden attempt to flee contributed to Officer Bendel's suspicion of criminal activity.

For all of these reasons, the totality of the circumstances demonstrates that Officer Bendel had reasonable suspicion to justify prolonging the duration of the traffic stop.

Kyle Clark also argues that the subsequent warrantless roadside search of the vehicle was unlawful.  Under the automobile exception to the warrant requirement, a police officer who has made a lawful roadside stop of a vehicle may search the passenger compartment and trunk of the vehicle if the officer has the requisite probable cause to support the search.  *United States v. Walker*, 840 F.3d 477, 483 (8th Cir. 2016).  "Probable cause for a search under the automobile exception exists if the facts and circumstances known to the officers when they began the search were sufficient in themselves for a person of reasonable caution to believe that contraband or evidence of

criminal activity was present in the vehicle."  *Id.*  "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."  *United States v. Smith*, 990 F.3d 607, 612 (8th Cir. 2021) (internal quotation marks and alterations omitted).  Here, Officer Bendel observed suspected drug paraphernalia in plain view on the backseat of the vehicle.  This observation, together with all of the other facts known to Officer Bendel as described above, provided Officer Bendel with probable cause to search the entire vehicle for drugs and drug paraphernalia.  *Id.*  Kyle Clark's arguments to the contrary are unavailing.

For these reasons, the Court overrules Kyle Clark's objections to the aspects of the R&R pertaining to the November 2, 2019 traffic stop and vehicle search.

## 2.    Search Warrants

Kyle Clark also objects to the R&R's assessment of the affidavits submitted in support of the four search warrants that officers obtained to search Kyle Clark's vehicle, cell phone, iCloud account and Facebook account.  In his objections, Kyle Clark does not challenge these four warrants individually, but instead contends that "the warrants may be evaluated collectively" because they "share much of the same verbiage and the same impediments."

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const. amend. IV.; *see also United States v. Fiorito*, 640 F.3d 338, 345–46 (8th Cir. 2011) (recognizing that a search warrant may issue on a showing of probable cause).  Whether probable cause exists is a "common-

sense decision" that weighs the totality of the circumstances that are detailed in a warrant application. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  A court reviewing a probable-cause determination must give "great deference" to the issuing court's probable-cause assessment. *Id.* at 236 (internal quotation marks omitted).  If the issuing court's decision to issue a warrant relied solely on the supporting affidavit, then "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999) (internal quotation marks omitted).  Probable cause requires a nexus between the evidence sought and the location to be searched. *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007).

Kyle Clark first argues that the search warrant affidavits are tainted by evidence unlawfully obtained from the November 2, 2019 traffic stop and vehicle search.  But for the reasons addressed above in Part II.A.1. of this Order, the November 2, 2019 traffic stop and vehicle search were lawful.  Therefore, this argument is unavailing.

Kyle Clark next argues that, because police have no evidence linking him to the September 2019 post office robbery, details about the robbery that are included in the search warrant affidavits do not establish probable cause.  But the fact that a search warrant application might contain extraneous information contextualizing a broader investigation does not establish that the warrant is invalid.  Instead, the Court must evaluate whether the search warrant affidavits establish the required nexus between the evidence sought and the location to be searched.  *Id.*

According to Kyle Clark, the disputed search warrant affidavits lack a nexus between the crime he is alleged to have committed and his phone, his iCloud account and his Facebook account. But he does not identify any legal or factual error in the magistrate judge's evaluation of this argument. Kyle Clark selectively quotes from portions of the search warrant affidavits suggesting that his phone, iCloud account and Facebook account "may" contain evidence of Kyle Clark's motive and intent and "may" contain communications related to the post office robbery, arguing that these statements are too speculative to support probable cause. But, as the R&R correctly observes, Kyle Clark ignores large portions of the search warrant affidavits. The affidavits all describe a pattern of money orders being sent from Redby, Minnesota, in exchange for priority mail packages sent from California to Redby or Red Lake, Minnesota. The affidavits also include details about Kyle Clark and others purchasing thousands of dollars in money orders, which Kyle Clark deposited into the bank account of a Mexican citizen in September 2019. The affidavits include details about the November 2, 2019 traffic stop, including Kyle Clark's attempt to flee and the evidence of drug-trafficking activities seized from his vehicle. And the search warrant affiant attests that, in his experience, individuals involved in drug-trafficking activities often communicate through telephone calls, text messages, and internet-based messaging software on cellular devices to coordinate their activities.

With respect to Kyle Clark's cell phone, the affidavit provides that surveillance video from the post office depicts Kyle Clark using his cell phone during his September 2019 money-order transaction. In addition, police seized Kyle Clark's phone from his

vehicle along with a large quantity of methamphetamine, a firearm, a large amount of cash, money-order receipts, and other objects indicative of drug-trafficking activities. As such, the totality of the circumstances described in the search warrant affidavit establish the requisite nexus between Kyle Clark's phone and evidence of suspected drug-trafficking activities.

With respect to Kyle Clark's iCloud account, the search warrant affiant attests that the iCloud account was created in December 2018 and is associated with the phone seized from Kyle Clark's vehicle. In addition, that phone was registered to Kyle Clark one day before the September 2019 money-order transaction described in the affidavit. The affidavit also describes the type of information that typically is generated and stored in an iCloud account, including electronic communications, call history, contact lists, calendar events, reminders, notes, documents, images, videos, and the device user's location at particular times. The search warrant affiant attests that Kyle Clark and others "may have been involved in structuring money order purchases for the purpose of obtaining narcotics from California" and that Kyle Clark's iCloud account might contain information that could help investigators determine his whereabouts on dates relevant to packages being shipped to or from California as well as communications, photographs, ledgers, or other electronic records related to drug-trafficking activity. As such, the totality of the circumstances described in the search warrant affidavit establish the requisite nexus between Kyle Clark's iCloud account and evidence of suspected drug-trafficking activities.

With respect to Kyle Clark's Facebook account, the affidavit details some of the evidence recovered from Kyle Clark's iCloud account, including photographs depicting Kyle Clark and an alleged co-conspirator in possession of firearms, large amounts of cash, and drug paraphernalia.  Several of these photographs also appear on the publicly viewable portions of Kyle Clark's Facebook account.  The iCloud account also included a screenshot of a Facebook Messenger conversation in which an alleged co-conspirator sent Kyle Clark the address of an apartment in Wilmington, California, that matches an address to which money orders previously had been mailed from Redby, Minnesota.  The affidavit also describes screenshots of other similar Facebook Messenger conversations between Kyle Clark's alleged co-conspirators involving "shipments" and "payment." The search warrant affiant also describes the functionality of Facebook and the type of information that typically is generated and stored in a Facebook account, including contacts, events, notes, voice and video call histories, and text communication histories. As such, the totality of the circumstances described in the search warrant affidavit establishes the requisite nexus between Kyle Clark's Facebook account and evidence of suspected drug-trafficking activities.

For these reasons, the Court overrules Kyle Clark's objections to the aspects of the R&R pertaining to the four search warrants that law enforcement officers obtained to search Kyle Clark's vehicle, cell phone, iCloud account and Facebook account.

### B.    Graves's Objections

Graves objects to the R&R's assessment of the affidavits submitted in support of the search warrants that officers used to search his two Facebook accounts, arguing that

the facts in the affidavits do not support probable cause to search those Facebook accounts. The Court evaluates Graves's objections by examining the facts contained within the four corners of the search warrant affidavits. *See Etheridge*, 165 F.3d at 656.

### 1.   Graves's '0018 Facebook Account

Graves argues that the search warrant affidavit pertaining to his Facebook account ending in '0018 does not support a finding of probable cause because the affidavit does not establish the requisite nexus between the Facebook account and evidence of criminal activity.[4] Whether probable cause exists is a "common-sense decision" that weighs the totality of the circumstances that are detailed in a warrant application. *Gates*, 462 U.S. at 238. Here, the search warrant affidavit details the investigation of the alleged drug-trafficking conspiracy. These details include the pattern of money orders and packages that were sent between Minnesota and California; Kyle Clark's arrest and the evidence of drug-trafficking activity seized from his vehicle, phone, iCloud account and Facebook account; and Facebook Messenger correspondence between the alleged co-conspirators that appear to pertain to narcotics transactions.

The affidavit also includes details connecting the alleged drug-trafficking conspiracy to Graves and his Facebook account. Specifically, the affidavit describes communications between Graves and alleged co-conspirators Kyle Clark and White using Facebook Messenger in October and November 2019. These communications occurred close in time to the alleged drug-trafficking shipments and money-order transactions and

---

[4]   It is undisputed that the search warrant affidavit establishes that the '0018 Facebook account belongs to Graves.

include phrases such as "[how] much you got[?]," "who knows when more will come," "the cash has to be sent out," and "dude keeps ask[ing] [a]bout loot." The search warrant affiant attests that, based on his training and experience, these communications pertain to the sale of drugs. Indeed, these conversations also mention another alleged co-conspirator, Jose Arcega-Vejar, as well as his phone number and address in Mexico. According to the affidavit, law enforcement previously investigated Arcega-Vejar as a methamphetamine courier operating in California and, when they arrested Arcega-Vejar in 2015, he possessed 12 pounds of methamphetamine.

Graves contends that the Facebook Messenger conversations included in the search warrant affidavit are "cryptic at best" and do not reference drugs or drug dealing. As courts frequently recognize, individuals involved in drug-trafficking activities sometimes use cryptic slang or coded drug phrases to avoid detection. *See, e.g.*, *United States v. Avalos*, 817 F.3d 597, 601 (8th Cir. 2016) (recognizing that an expert witness may testify at trial about drug dealers' cryptic slang and coded drug phrases based on the expert's personal experience and training). Here, throughout the search warrant affidavit, the affiant describes his familiarity with slang terms associated with drug-trafficking activities based on his training and experience. It is true that the affidavit does not demonstrate that Graves personally used any of the drug-trafficking slang words identified by the affiant. But the affidavit establishes that other alleged co-conspirators were using such slang, and that Graves was communicating with those individuals— including Arcega-Vejar, who had been convicted of a federal drug offense in 2017— using similar cryptic language about payments, quantities, and "loot." As such, the

totality of the circumstances described in the search warrant affidavit establish the requisite nexus between Graves's '0018 Facebook account and evidence of suspected drug-trafficking activities.

### 2.    Graves's '6625 Facebook Account

Graves also argues that the search warrant affidavit pertaining to his Facebook account ending in '6625 does not establish a nexus between the Facebook account and evidence of criminal activity.[5] Whether probable cause exists is a "common-sense decision" that weighs the totality of the circumstances that are detailed in a warrant application. *Gates*, 462 U.S. at 238. Here, the search warrant affidavit details the investigation of the alleged drug-trafficking conspiracy. These details include the pattern of money orders and packages that were sent between Minnesota and California; Kyle Clark's arrest and the evidence of drug-trafficking activity seized from his vehicle, phone, iCloud account and Facebook account; and Facebook Messenger correspondence between the alleged co-conspirators that appear to pertain to narcotics transactions.

Graves does not challenge any of the foregoing details contained in the search warrant affidavit for the '6625 Facebook account. Instead, he argues that nothing in the search warrant affidavit links the forgoing details with his '6625 Facebook account. Graves is correct that the affidavit contains no direct evidence linking the alleged drug-trafficking conspiracy to the '6625 Facebook account. But Graves fails to recognize that a judge issuing a search warrant may "draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant," and

---

[5]    It is undisputed that the '6625 Facebook account belongs to Graves.

similarly, "law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant." *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (internal quotation marks omitted).

Here, the affidavit establishes that the '6625 Facebook account's user, Graves, became "friends" with alleged co-conspirator Arcega-Vejar's Facebook account during the time period of the alleged drug-trafficking conspiracy—specifically, on December 4, 2019. Approximately one month later, Arcega-Vejar sent a screenshot of a Facebook Messenger conversation between himself and a Facebook user named "Dru Gra…," which is phonetically similar to the name "Drew Graves."

Graves argues that this phonetic similarity is insufficient to establish the requisite nexus between his '6625 Facebook account and the conversation between a Facebook user named "Dru Gra…" and Arcega-Vejar. But this phonetic similarity must be viewed in the context of all the relevant circumstances, including reasonable inferences drawn from those circumstances. *See Brackett*, 846 F.3d at 992. The contents of this excerpted conversation involve vague language consistent with Facebook Messenger conversations between other alleged co-conspirators during the same time period, including conversations involving Graves's '0018 Facebook account. Specifically, Arcega-Vejar tells "Dru Gra…" that "things in California today came in and my people are ready to send you on Monday without fail," and Arcega-Vejar assures "Dru Gra…" that he "won't need to work." The affidavit explains that this conversation was *not* produced by Facebook pursuant to the previous search warrant that involved Graves's '0018 Facebook account, which suggests that the conversation involved a different Facebook account that

happened to use a name phonetically similar to "Drew Graves."[6]  From these facts, it is reasonable to infer that Arcega-Vejar's conversation with a Facebook user named "Dru Gra…" involved Graves's '6625 Facebook account.  As such, the totality of these circumstances, including reasonable inferences drawn from these circumstances, establish the requisite nexus between Graves's '6625 Facebook account and evidence of suspected drug-trafficking activities.

For these reasons, the Court overrules Graves's objections to the R&R.

### III.    Clear-Error Review

Because Defendants do not specifically object to any other aspect of the R&R, the Court reviews the remainder of the R&R for clear error.  *See* 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59; *United States v. Newton*, 259 F.3d 964, 966 (8th Cir. 2001); *accord Grinder*, 73 F.3d at 795.  Having carefully performed this review, the Court finds no clear error and adopts the R&R.

### ORDER

Based on the R&R, the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

1.    The magistrate judge's September 15, 2021 Order, (Dkt. 203), is **AFFIRMED**.

2.    Defendant Kyle Dale Clark's objections to the September 15, 2021 R&R, (Dkt. 211), are **OVERRULED**.

---

[6]    The search warrant affiant also explains that Facebook users can change the name associated with a Facebook account at any time.

3.       Defendant Drew William Graves's objections to the September 15, 2021 R&R, (Dkt. 208), are **OVERRULED**.

4.       The September 15, 2021 R&R, (Dkt. 204), is **ADOPTED**.

5.       Defendant Kyle Dale Clark's motions to suppress evidence, (Dkts. 125, 126), are **DENIED**.

6.       Defendant Drew William Graves's motion to suppress evidence, (Dkt. 135), is **DENIED**.

7.       Defendant Valerie Ann Clark's motion to suppress evidence, (Dkt. 145), is **DENIED**.


Dated:  December 1, 2021                              s/Wilhelmina M. Wright
                                                     Wilhelmina M. Wright
                                                     United States District Judge